**UNITED STATES STEEL CORPORATION, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 19423.

United States Court of Appeals, Sixth Circuit.

May 6, 1970.

Edgar E. Barton, New York City, (White & Case, New York City, on the brief), for petitioner. Laura Banfield, New York City, of counsel.

Jerold D. Cummins, Federal Trade Commission, Washington, D. C. (John V. Buffington, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Frederick H. Mayer, Attys., Federal Trade Commission, Washington, D. C., on the brief), for respondent.

Before PHILLIPS, Chief Judge, CELEBREZZE, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge.

CELEBREZZE, Circuit Judge.

This is a proceeding to review an order of the Federal Trade Commission ["Commission"] requiring the United States Steel Corporation ["U.S. Steel"] to divest itself of the assets of Certified Industries ["Certified"]. The Commission ordered divestiture based upon its finding that the acquisition of Certified—the largest non-integrated customer of portland cement among concrete producers in the New York Metropolitan Area—by the U.S. Steel—the largest non-integrated supplier of portland cement in the same metropolitan area—violated Section 7 of the Clayton Act, as amended. 15 U.S.C. § 18 (1964).

## I. THE FACTS AND PROCEEDING BELOW

U.S. Steel acquired Certified on April 30, 1964. On January 22, 1965, the Commission issued a complaint alleging that "the effect of the acquisition * * * both in itself and by aggravating the present industry trends towards vertical integration [and concentration] between suppliers and consumers of portland cement may be substantially to lessen competition * * * in the production and sale of portland cement and ready-mixed concrete in the New York City metropolitan area * * * [and] in adjoining markets." In its answer, U.S. Steel denied that the acquisition had the requisite anti-competitive effects for a violation of Section 7. U.S. Steel further alleged that the acquisition was immunized from attack under Section 7 by the "failing company" doctrine of International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930).

After hearings were held, the hearing examiner issued a decision dismissing the complaint. The Commission, on appeal, overruled the initial order of the hearing examiner. The Commission found: (1) that the effect of the acquisition may be substantially to lessen competition in a relevant area of competition; and (2) that the failing condition of the company did not immunize its acquisition from the scope of Section 7 prohibitions

as there was no overriding interest in preserving Certified from possible bankruptcy. Each of these conclusions is challenged in this action

**U.S. Steel, The Acquiring Company.** U.S. Steel was the nation's seventh larg-industrial corporation in 1965, with sales est industrial corporation in 1965, with sales in excess of $4.0 billion. It was the country's largest manufacturer of steel and a major integrated producer of raw materials for the production of iron and steel products and building materials.

Through its Universal Atlas Cement Division ["U.A.C."], U.S. Steel is one of the nation's four largest portland cement manufacturers. It operates 11 cement plants, has an annual capacity of over 30 million barrels, and serves 37 states. U.A.C. serves the New York City metropolitan area ["NYMA"] from plants located at Hudson, New York and Northhampton, Pennsylvania.

**Certified, The Acquired Company.** Certified, at the time of the acquisition and for a number of years prior thereto, produced and sold ready-mixed concrete and mineral aggregates. At the close of 1963, four months prior to the acquisition, Certified had nearly $9 million in assets and was generating sales at an annual rate of approximately $12 million. During that same year Certified made substantial purchases of portland cement from sources located outside the State of New York. In that same time period Certified's subsidiary, Northern Light-Weight Aggregates, Inc., made shipments of expanded shale valued at $205,757, to destinations outside of the State of New York.

Starting in 1953 as a small, one-plant, four-truck, ready-mixed concrete company doing business in Suffolk County,

Certified rapidly expanded. By 1961, it had acquired the assets of a number of other ready-mixed concrete companies, thereby expanding its sales area throughout Long Island and New York City proper.

At the time of the acquisition it was one of the four largest ready-mixed concrete producers and the second largest consumer of portland cement among the concrete producers in the New York metropolitan area. It owned several pits for the extraction of sand and gravel, a quarry for the extraction of lightweight aggregates, and 181 trucks, including 117 ready-mix trucks.

**The Background of the Acquisition.** In 1961, Certified completed two major acquisitions. These acquisitions placed heavy capital requirements on Certified's already-thin capital structure. In the fall of 1961, Certified negotiated extended credit arrangements with four of its suppliers, in an aggregate amount of $350,000. In January, 1962, Certified was issued a 12-month interest-bearing note for $150,000 by U.A.C. on the purchases of cement which it had made from U.A.C. In December, 1962, Certified notified U.S. Steel that it would have difficulty paying off the U.A.C. note. U.S. Steel recommended to Certified that it consider long-term financing and arranged a meeting between the President of Certified and officials of Bankers Trust Company of New York, in which U.S. Steel was a substantial depositor. Thereafter, Certified borrowed up to four million dollars from Bankers Trust on a loan secured by Certified's assets and guaranteed by a "notes purchase agreement" from U.S. Steel.

This additional influx of funds did not rescue the troubled Certified.[1] Nor was

---

1. While its sales for the year ending June, 1963, reached a corporate record of $14,325,991, it lost $655,850 on its operations. In the first six months of fiscal 1964, Certified's sales were just in excess of $6 million, but its losses for that period were at a rate of nearly $155,000 per month. During the next four months of operations, Certified's financial position worsened rapidly as sales declined to just

over $2 million and losses were running in excess of $200,000 per month. Furthermore, apart from its indebtedness to U. S. Steel and Bankers Trust, Certified was unable to meet the normal trade obligations of its basic suppliers, had a deficit in its net working capital of $279,000 as of January 31, 1964, and could not meet the interest payments due on its outstanding debentures.

Certified able to reestablish its financial security through a favorable sell-out.[2] In November, 1963, Certified turned towards U.S. Steel as a merging partner.

After some discussions, U.S. Steel purchased all Certified's assets, assumed all its liabilities, and paid Certified shareholders slightly over $1 million for all its shares. Subsequent to the acquisition, Certified's business has operated as a division of U.S. Steel with Robert A. Ragio, Treasurer of U.A.C. (U.S. Steel's cement-producing subsidiary) as President of the Certified Division.

While Certified had frequently purchased U.A.C.'s cement prior to its January 1962 note, Certified's purchases of U.A.C. cement intensified as the vertical financial arrangements between the two companies increased, as the following figures indicate:

| Year | Certified's Cement Purchases from UAC (Bbl.) | Certified's total Cement purchase (Bbl.) | Proportion of total cement purchases |
|---|---|---|---|
| 1961 | 36,675 | 451,989 | 8.4% |
| 1962 | 123,731 | 823,352 | 14.9% |
| 1963 | 567,470 | 1,054,072 | 53.8% |
| 1964 | 701,151 | 793,479 | 88.4% |

Since the acquisition took place in March 1964, it may be inferred that most, if not all, of Certified's purchases from suppliers other than U.A.C. took place prior to the acquisition. In the post-acquisition period Certified has purchased substantially all of its cement requirements from U.A.C.

At no point during the years under discussion was there a formal agreement by Certified to purchase a specified percentage of its cement requirements from U.A.C. There is unrebutted evidence, however, that such proposals were submitted to Certified by U.A.C. and some minimum form of commitment was tacitly understood by the parties. U.S. Steel's purpose in extending its credit, its guarantees, and, ultimately its funds to purchase Certified was revealed in a memorandum from its Executive Vice President to its Board of Directors:

"If Certified ceases operations Universal Atlas Cement would suffer an irreplaceable loss in its present market for its Hudson product and be seriously embarrassed commercially in one of its major markets during the last sixty years."

■ **The Relevant Markets.** Section 7 of the Clayton Act does not outlaw every vertical acquisition of stock or assets whose effect "may be substantially to lessen competition," but rather it proscribes only those arrangements which have that requisite effect "in any line of commerce in any section of the country." As the United States Supreme Court observed in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8

2. From early 1962 through November, 1963 Certified had explored the possibility of selling out to numerous prospective purchasers including Colonial Sand & Stone Company, Triangle Lumber Corporation, North American Cement Company, American Cement Company, Alpha Portland Cement Company and Seagrave Corporation. For a variety of reasons including adverse responses from the Federal Trade Commission, insufficient price and the unfavorable responses of U. S. Steel, no negotiations reached fruition.

L.Ed.2d 510 (1962) (applying the Clayton Act to a vertical merger),

"The 'area of effective competition' must be determined by reference to a product market (the 'line of commerce') and a geographic market (the 'section of the country')." 370 U.S. at 324, 82 S.Ct. at 1523.

Products Markets. The Commission found that "portland cement"[3] and "ready-mixed concrete,"[4] defined as stipulated by the parties, are appropriate product markets for purposes of this proceeding and are relevant lines of commerce within the meaning of Section 7 of the Clayton Act.

■■ The Geographic Markets. Although relevant geographic markets are not "susceptible to a (precise) 'metes and bounds' definition," the appropriate market is characterized as "the area in which the seller operates and to which the purchaser can practically turn for supplies." Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 331, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1960). Since the primary impact of the instant acquisition falls upon the customer-supplier relationship between Certified—which operates almost exclusively in the NYMA—and its potential suppliers—to whom Certified can practically turn for portland cement, the geographic market can be no broader than the area in which Certified's potential suppliers can turn if they lose Certified's business. In addition, within this broad geographic market, well defined submarkets may exist which, in themselves, constitute geographic markets for

antitrust purposes. See Brown Shoe Co. v. United States, 370 U.S. at 325, 82 S.Ct. 1502.

Applying these principles, we affirm the Commission's findings as to the relevant product markets (portland cement and ready-mixed concrete) and geographic markets (the Northeastern United States[5] and NYMA[6] in the sale of portland cement and the NYMA for producers of ready-mixed concrete) for purposes of these proceedings.

The Structure of the Cement Industry in the Pertinent Markets. Approximately 20 companies ship cement into both the NYMA and the Northeastern United States market area; the four largest of which accounted for almost 37 per cent of the total cement shipments in the northeastern market in 1960. In that year, none of those four companies was vertically integrated. However, in 1964, the share of the top four companies had increased to 43.6 per cent and two of these companies (U.A.C. and Colonial) were vertically integrated.

Focusing on the NYMA submarket, the structure of the cement industry is more concentrated. The top eight companies which sell cement in the NYMA accounted for 67.9 per cent of the shipments in the NYMA in 1960 and 70.8 per cent in 1964. The top four companies in the market controlled 44.8 per cent of the sales in 1960 and 53.4 per cent in 1964. The gradual increase in the concentration ratios of the leading firms in the market took place while the total shipments of cement into the NYMA in-

3. "Portland cement" is the material which in the presence of water binds aggregates such as sand and gravel into concrete. Not only is it an essential ingredient in the manufacture of concrete, but there is no practical substitute for portland cement in the manufacture of concrete.

4. "Ready-mixed concrete" is concrete delivered to customers in an unhardened plastic state. Firms which engage in the production of ready-mixed concrete are the principal users of portland cement in the nation, comprising about 60 per cent of the total national production of ce-

ment. Further, ready-mixed concrete firms in metropolitan centers may consume 70 per cent or more of all the portland cement purchased in those areas.

5. Includes Eastern New York, Eastern Pennsylvania, New Jersey, Connecticut, Massachusetts, Rhode Island, Vermont, New Hampshire, Delaware and part of Maryland. Over 90 per cent of all the shipments of cement producers serving NYMA are sold within the described area.

6. The five counties of New York City and Richmond, plus the Long Island counties of Nassau and Suffolk to the east and Westchester County to the north.

creased 10 per cent from 10.6 million barrels to 11.7 million barrels.

These increases in the concentration of the cement industry may be largely attributed to the performance of two companies: Colonial Sand & Stone and U.A.C.[7] The growth rates of these two companies were several times the growth rates of the NYMA and Northeastern markets.[8]

**The Structure of the Ready-Mixed Concrete Industry in the NYMA.** The NYMA is served by over 50 ready-mixed concrete producers, but only six or seven of these do business throughout all or large portions of the area.[9] In 1958, when none of the leading firms in the market was vertically integrated, the shipments of the four largest firms represented 52 per cent of the value of total shipments of ready-mixed concrete in the NYMA. At all times during the years 1962–1964, at least three of the leading six firms had some form of vertical arrangements. In 1962, 1963, and 1964, the four largest firms consumed 81.2 per cent, 80.7 per cent and 73.5 per cent, respectively, of all shipments of cement to ready-mixed producers.

**Trends in NYMA Towards Vertical Integration In The Manufacture and Sale of Cement and Ready-Mixed Concrete.** The cement and ready-mixed concrete industries are being subjected to strong pressures to vertically integrate their operations. During the period between 1962 and 1964, cement purchases in the NYMA dropped by approximately 18 per cent because of a slackening in construction activity. A sharp decline in the price of cement did not halt the decline in the demand for portland cement.

7. Colonial, the dominant cement supplier in the NYMA, became vertically integrated by internal generation late in the decade of the fifties. From 1960 through 1964, it increased its share as a supplier of cement to the NYMA from 2.4 million barrels, or 22.6 per cent, to 3.6 million barrels, or 31.2 per cent. During the same period, U.A.C. increased its shipments from 766,000 barrels, or 7.6 per cent, to 1.3 million barrels, or 11.4 per cent of total shipments.

8. In contrast to the 10 per cent growth rate of the NYMA and the 20 per cent growth rate in the Northeastern market, U.A.C.'s cement shipments in the two markets grew by 73.5 and 80.5 per cent, respectively.

9. The examiner found that the approximate shares of the principal ready-mixed concrete companies in 1964, the year of acquisition, and the preceding two years were as follows:

| Name | Per Cent of Total Shipments | | |
| --- | --- | --- | --- |
| | 1962 | 1963 | 1964 |
| Colonial Sand & Stone | 49.9% | 49.8% | 50.1% |
| Certified | 8.6 | 11.7 | 9.8 |
| Transit Mix Concrete Corp. | 12.7 | 10.4 | 7.2 |
| Ryan Ready Mixed Concrete | 10.0 | 8.8 | 6.4 |
| M. F. Hickey | 5.1 | 4.8 | 3.4 |
| Cooney Brothers | 2.4 | 2.3 | 2.5 |
| Century Transit Mix | 1.9 | 1.5 | 3.1 |

In terms of total cement consumption in the NYMA by all firms (ready-mixed concrete companies and all other consumers of cement), the respective shares of the principal ready-mixed manufacturers were as follows:

| Name | Per Cent of Total Cement Consumption | | |
| --- | --- | --- | --- |
| | 1962 | 1963 | 1964 |
| Colonial Sand & Stone | 34.2% | 34.8% | 35.1% |
| Certified | 6.0 | 8.2 | 6.7 |
| Transit Mix Concrete Corp. | 8.8 | 7.3 | 5.0 |
| Ryan Ready-Mixed Concrete | 7.0 | 6.2 | 4.5 |
| M. F. Hickey | 3.5 | 3.4 | 2.4 |
| Cooney Brothers | 1.7 | 1.6 | 1.8 |
| Century Transit Mix | 1.3 | 1.1 | 2.1 |

During this temporary period of imbalance between the supply and demand for cement products, several cement companies sought to assure themselves of regular high-volume outlets for their cement production to offset their high fixed costs. Since 1960, four of the leading six ready-mixed producers had their open market demands for portland cement foreclosed by the vertical acquisitions of leading cement manufacturers. American Cement Corporation acquired M. F. Hickey Company, the fifth leading consumer of cement among the ready-mixed producers in NYMA, in January 1960.[10] National Portland Cement Company acquired Ryan Ready Mixed Corporation, the fourth leading consumer, in September, 1963.[11] U.S. Steel's subsidiary, U.A.C., acquired Certified, the second leading consumer in April 1964.[12] Marquette Cement Manufacturing Company acquired Cooney Brothers, Inc., the sixth leading consumer, and related corporations in November, 1964.[13] Moreover Colonial Sand & Stone, the leading consumer of cement among the ready-mixed producers generated three-fourths of its own cement requirements by internal expansion into the production of cement.[14] Thus, during the years 1960 to 1964, five of the leading six consumers of cement among the ready-mixed producers in the NYMA experienced vertical integration. Several of the remaining non-integrated cement firms competing with the integrated companies expressed their "oppos[ition] to vertical integration * * *" but conceded that "they might have to acquire a ready-mix company in order to protect their market."[15]

Finally, it should be noted that the NYMA is the only area in the Northeast to which the national trend towards the integration of the cement and concrete industries has spread.

## II. THE REQUISITE ANTICOMPETITIVE EFFECT

■■ Section 7 of the Clayton Act, as amended, was intended by Congress to "arrest *in their incipiency* restraints * * * in a relevant market," [Emphasis added.] United States v. E. I. duPont & Co., 353 U.S. 586, 589, 77 S.Ct. 872, 875, 1 L.Ed.2d 1057 (1957), and to reach out beyond acquisitions which pose a "clear-cut menace to competition." Brown Shoe Co. v. United States, 370 U.S. 294, 323, 82 S.Ct. 1502, 1523 (1962).

In determining whether the effect of an acquisition "may be substantially to

10. A consent decree requiring divestiture was entered into in January, 1964, FTC Docket No. C-681. Even after divestiture, over 75 per cent of Hickey's cement requirements are purchased from American Cement which is financially tied to American by virtue of a $3.2 million purchase money mortgage.

11. A hearing examiner found this acquisition did not violate the Clayton Act § 7. FTC Docket No. 8654. The decision was vacated as moot in that National meanwhile divested itself of the acquired properties.

12. Which is the subject of the instant case.

13. A hearing examiner dismissed a complaint charging a violation of Clayton Act § 7; and the Commission reversed the examiner and ordered divestiture.

14. While vertical integration by internal generation creates many of the same evils as does such integration by acquisition, it is not a specific subject of concern of the Clayton Act § 7. The most frequent explanation given for not proscribing internal generation of vertical facilities is that such expansion generates an additional competitive factor in the market place, rather than merely changing the ownership of an existing competitive unit. Hence, it is more likely than acquisition of existing facilities to intensify product, price and service competition. Also, such internal generation being less likely to succeed because one must compete with the existing utilization of facilities is less dangerous to competition in the market place. United States v. Kennecott Copper Corp., 231 F.Supp. 95, 102-104, 104 n. 6 (S.D.N.Y. 1964), aff'd. per curiam, 381 U.S. 414, 85 S.Ct. 1575, 14 L.Ed.2d 692 (1965).

15. The hearing examiner credits five such instances. In addition, the hearing examiner found that the pressures created by the vertical integration of other cement companies was a prime or significant consideration in each of the acquisitions by Marquette, National and U.A.C.

lessen competition" the "incipiency" standard is to be applied functionally. Brown Shoe Co. v. United States, supra, 370 U.S. at 294, 82 S.Ct. at 1502. In dealing with vertical acquisitions under Section 7, as amended, the United States Supreme Court has relied on several functional factors as indicia of the requisite anti-competitive effect: (1) foreclosing of the competitors of either party from a segment of the market otherwise open to them; (2) the "nature and purpose" of the vertical arrangement; (3) actual and reasonable likely adverse effects upon local industries and small businesses; (4) the level and trend of concentration in the market shares of participating companies, including any trend towards domination by a few leaders; (5) the existence of a trend towards vertical integration and consolidation in previously independent industries; and (6) the ease with which potential entrants may readily overcome barriers to full entry and compete effectively with existing companies. FTC v. Consolidated Foods, 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965); United States v. Kennecott Copper Corp., 231 F.Supp. 95 (SDNY1964), aff'd per curiam, 381 U.S. 414, 85 S.Ct. 1575, 14 L.Ed.2d 692 (1965); Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502 (1962). These same factors were considered in holding horizontal and product-extension acquisitions violative of the Clayton Act § 7. FTC v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1964); United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. Alcoa, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Similar factors were considered in holding an acquisition of stock of vertically related concerns violative of the old Section 7, prior to the 1950 amendments. United States v. E. I. duPont, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1956). The Commission has found the presence of each of the above six factors and their attendant anticompetitive consequences in the instant acquisition. We find substantial evidence to support each of these determinations.

**Foreclosure.** The Commission found the foreclosure of U.S. Steel's competitors from a substantial share of the portland cement market to be "very significant." Foreclosure of a customer of portland cement by one of its suppliers has as its primary vice, in the instant acquisition, the tying of Certified's purchases of cement to U.A.C's supplies on a permanent basis. A segment of U.A.C. supply of cement and substantially all of Certified's demand for cement will be foreclosed from their respective competitors. A segment of the market otherwise open to the competing members of the two industries is removed from the open market. As the United States Supreme Court noted in *Brown Shoe*:

"[T]he arrangement may act as a 'clog on competition,' Standard Oil Co. of California v. United States, 337 U.S. 293, 314, 69 S.Ct. 1051, 1062, 93 L.Ed. 1371, which 'deprive[s] * * * rivals of a fair opportunity to compete.' H. R.Rep. No. 1191, 81st Cong., 1st Sess.[8]" 370 U.S. at 324, 82 S.Ct. at 1523.

The acquisition of Certified by U.S. Steel climaxed a three year vertical-financial relationship between the two which, since its inception, had led to increasing dependency of Certified upon U.A.C. cement supplies. In 1961, the last year in which U.S. Steel had no vertical relationship with Certified, the latter purchased only 36,675 barrels of cement, or 8.4 per cent of its total requirements from U.A.C. In 1964, the year of the acquisition, Certified purchased 701,151 barrels of cement or 88.4 per cent of its requirements from U.A.C. The pattern of increasing sales paralleling the financial involvement of U.S. Steel and the evidence of "tacit" and "expected" minimum purchases in return for extension of credit and favors provides very substantial evidence to support a finding that all,

or nearly all, of Certified's purchases of portland cement actually or probably were foreclosed from the competitors of U.A.C.

The Commission's finding that this foreclosure is "extremely significant" is supported by the market structure in the cement and ready-mixed industries. The cement industry is a concentrated one, both nationally, regionally, and within the NYMA.[16] In 1964, U.S. Steel was one of the four largest producers of cement nationally and in the Northeastern United States. In addition, it was the second largest producer of cement in the NYMA. This position was achieved by capturing the several-hundred-thousand-barrel demand of Certified, the largest open market purchaser of cement in the NYMA and one of the five or ten largest purchasers in the entire Northeastern market. The Commission found that the acquisition brought about the largest single foreclosure which could have been obtained in the relevant geographic markets of the cement-concrete industries.[17]

Placing these facts in percentage terms further validates the Commission's conclusion. In 1964, Certified represented 9.8 per cent of the cement purchases by ready-mixed concrete companies and 6.7 per cent of total cement consumption in the NYMA. In the same year, U.S. Steel shipped 11.4 per cent of the total shipments of cement into the NYMA. While no precise percentage terms have been set forth as yardsticks for vertical mergers, the 9.8 per cent of Certified and 11.4 per cent of U.A.C. are well within the range of numbers which have been held to be unduly high in the past.[18] Further, the oligopolistic and vertically integrated nature of the cement and concrete industries increases the significance of these percentages.[19] There is sub-

16. See "Mergers and Vertical Integration in the Cement Industry," a Staff Economic Report, April 26, 1966; "Public Hearings" of the Commission, July, 1966; Commission Enforcement Policy with Respect to Vertical Mergers in the Cement Industry, January 17, 1967.

17. Colonial Sand and Stone purchases more cement in the NYMA and in the Northeast, but most of its requirements are met by purchases from its own cement plant. They are not met by open-market purchases.

18. In *Brown Shoe*, Brown Shoe which manufactured 4.9 per cent of the nation's infants' and babies' shoes, was not permitted to acquire Kinney which retails 1.5 per cent of the nation's infants' and babies' shoes market. Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). In *Kimberly-Clark*, Kimberly Clark, which manufactured 7.5 per cent of the United States market shipments of printing and fine papers was divested of its acquisition of Blake Moffitt and Towne which accounted for 2 per cent of national paper merchant distribution. United States v. Kimberly-Clark Corp., 264 F.Supp. 439 (ND Cal.1967). In *Standard Oil*, Standard, which purchased 17 per cent of all the potash sold in the United States, was prevented from acquiring the Potash Company of America, which produced about one per cent of all the domestic potash in the United States. United States v.

Standard Oil Co., 253 F.Supp. 196 (D.N. S.1966). Not surprisingly, the acquisition also exceeds the per cent guidelines set out by the Justice Department in its statement of Antitrust Policy for Vertical Mergers:

"[T]he department will ordinarily challenge a merger or series of mergers between a supplying firm, accounting for approximately 10 per cent or more of the sales in its market, and one or more purchasing firms, accounting in toto for approximately 6 per cent or more of the total purchases in that market * * *." Department of Justice Enforcement Policy, May 30, 1968. CCH Trade Regulation Reports Par. 4430 at 6686.

19. The market for portland cement was clogged at the time of the acquisition by prior vertical foreclosure of 56.5 per cent of the cement consumption by ready-mixed concrete firms and 39.6 per cent of total cement consumption. After the instant acquisition, the market segment in which non-integrated cement companies could seek outlets was reduced to barely one-third (33.7 per cent) of all ready-mixers and to one-half (53.7 per cent) of all cement consumers in the NYMA. As will be shown later, such small "open markets" proved unable to support previously independent competitors of U.A.C., many of whom were forced to integrate vertically or leave the NYMA.

stantial evidence to uphold the Commission's finding that the foreclosure which resulted from the acquisition is economically "extremely significant" and "anticompetitive."

■ **Nature and Purpose.** In determining if a specific market share of foreclosure is violative of Section 7 of the Clayton Act, references may be made to the nature and purpose of the vertical arrangement. Brown Shoe Co. v. United States, supra, 370 U.S. at 329, 82 S.Ct. 1502. The nature and purpose of the present acquisition reinforces the Commission's finding as to the anticompetitive significance of the foreclosure by the acquisition.

The "nature" of this vertical arrangement is an acquisition, a permanent restructuring of the supplier-customer relationship. Kessler and Stern, Competition, Contract and Vertical Integration, 69 Yale Law Journal 1, 78 (1959). It is not a "limited term exclusive-dealing contract" or the use of tying "to aid a small company in an attempt to break into a market." Brown Shoe Co. v. United States, supra, 370 U.S. at 330, 82 S.Ct. at 1526. See Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); Harley-Davidson Motor Co., 50 F.T.C. 1047, 1066.

The "purpose" of the arrangement was in the words of the U.S. Steel's management "to insure Universal Atlas Cement participation in the New York market." This "purpose" was successfully implemented by the tremendous increase in cement purchases made by Certified subsequent to the initiation of a vertical relationship between U.S. Steel and Certified. Just as the United States Supreme Court found Brown Shoe's desire to "force" its shoes into Kinney's stores in the post-acquisition period to be an adverse purpose, so is U.S. Steel's purpose of "insuring participation" obnoxious. Brown Shoe Co. v. United States, supra, 370 U.S. at 330, 82 S.Ct. 1502. The im-

portant consideration is that the acquired company would not be free to choose for itself who shall supply its needs solely on the basis of price, service and quality of goods because the acquiring company has the power to substitute its own suppliers, and the intention of doing so. United States v. E. I. duPont, supra, 353 U.S. at 607, 77 S.Ct. 872; United States v. Kimberly-Clark, supra, 264 F. Supp. at 464. We find there is substantial evidence that the nature and purpose of the acquisition support the Commission's finding that the resultant foreclosure was "very significant" and "anticompetitive."

**Actual Effects on Local Business.** The testimony in this case reveals numerous actual anticompetitive effects of the acquisition upon local business concerns in both the ready-mix concrete and portland cement industries. One of the impelling instructions of the antitrust laws has been the protection of small businesses and local control from the "attendant adverse effects" of oligopolistic markets and economic concentration.

The vertical alignment of Certified and U.A.C., as the Examiner found, had immediate and significant effects on several of the cement and concrete competitors in the NYMA. Alpha Portland Cement Company, which manufactured cement in the Hudson River Valley and opened a terminal on Long Island, was forced to close its local terminal because of its loss of Certified as a customer for its cement.[20] Triangle Cement, which acted as a distributor for Atlantic Cement, closed its terminal in Brooklyn at the end of their distributorship contract. Triangle was Certified's third largest supplier in 1963, but sold it no cement in 1964.[21] Several ready-mix companies indicated they were forced to expand or shift their sales territories to areas where there was less vertical integration because of the competitive forces in

---

20. Alpha's sales to Certified declined from a peak of 322,000 barrels in 1962 to 2800 barrels in 1964.

21. Triangle's sales to Certified declined from 95,000 barrels in 1963 to none in 1964.

vertically integrating markets.[22] A number of cement company officials also indicated that while opposed to vertical integration, they might have to acquire a ready-mix company to protect their market. The Examiner specifically found that at least one of the vertical acquisitions in the industry [23] was caused, in part, by U.A.C.'s acquisition of Certified.

These actual adverse effects on competitors of U.A.C. and Certified are further substantial evidence supportive of the Commission's finding that the acquisition was anticompetitive.

**Concentration.** The Commission found that concentration in the cement industry had been "aggravated" as a result of the acquisition. Any increase in concentration in industries whose concentration levels are already "great" is alarming because such increases make so much less likely the possibility of eventual deconcentration. United States v. Philadelphia National Bank, supra, 374 U.S. at 365 n. 42, 83 S.Ct. 1715. Thus, in Alcoa, the Aluminum Corporation of America, a leading producer of aluminum conductor with 27.8 per cent of an oligopolistic market, was not permitted to acquire Rome Cable Corporation, which produced 1.3 per cent of the aluminum conductor. The United States Supreme Court observed "[t]he presence of small but significant competitors * * * may well * * * thwart" the further development of an oligopolistic, concentrated industry. United States v. Alcoa, supra, 377 U.S. at 280, 84 S.Ct. at 1289.

The facts indicate that between 1961 and 1964 U.A.C. advanced its position from sixth to second largest producer of portland cement in the NYMA because of its vertical relationship with Certified.[24] This increase along with the increase in share of the vertically integrated Colonial, raised the combined shares of the four largest cement companies shipping to the NYMA from 44.8 per cent in 1960 to 53.4 per cent in 1964. Similarly, the shares of the four leading cement companies shipping in the Northeast increased from 37 per cent in 1960 to 43.6 per cent in 1964. U.S. Steel increased its shipment by 80.5 per cent in the Northeast area, compared with an average increase of 20.2 per cent for all firms, and became one of the largest shippers in the market.

We find substantial evidence to support the Commission's finding that the acquisition of Certified, as an assured source of supply, was a significant element in the increasing concentration ratios of the leading firms in the cement industry.

**Vertical Integration.** The Commission found that there was a trend toward vertical integration in the cement and concrete industries, that non-integrated concerns were at a growing competitive disadvantage, and that this acquisition stimulated these adverse factors and gave U.S. Steel decisive competitive advantages.

■ One of the purposes of Section 7 is to reverse the trend toward concentration in American industry. Thus an ac-

---

22. See Vertical Integration, infra, for the deleterious effects of vertical integration on the competitive conditions in the cement and concrete industries.

23. Marquette became vertically integrated in June, 1964, in response to substantial foreclosure of its ready-mix accounts by the vertical integration of Colonial and Certified. Finding of Trial Examiner No. 125.

24. U.A.C.'s extraordinary rate of growth directly parallels its vertical relations with Certified. In 1961, U.A.C. sales dropped from 766,000 barrels to 612,000 barrels, of which 36,675 were purchased by Certified. By 1964, U.A.C. sales totaled 1,300,000 barrels of which 701,151 were purchased by Certified alone. Certified's purchases of U.A.C. cement rose from 6 per cent of U.A.C.'s output in 1961 to 53 per cent of U.A.C.'s output in 1964, the year of the acquisition. All of the 563,000 barrels, or 73.5 per cent, rise in U.A.C.'s sales is attributable to U.A.C.'s incremental sales to Certified, after U.A.C. had established vertical financial ties to Certified.

quisition which may be viewed as part of an industry-wide trend toward vertical integration may be considered particularly obnoxious to Section 7. "[R]emaining vigor cannot immunize a merger if the trend in that industry is towards oligopoly [or vertical integration]." 370 U.S. at 332–333, 82 S.Ct. at 1528.

The evidence reveals wide-scale national and urban trends towards vertical integration and concentration in the cement and concrete industries since 1958. Cement companies in the NYMA have been seeking assured outlets for their products by acquiring the remaining large independent ready-mix operations.[25] Among other factors, the Commission's response to these pressures to vertically integrate has resulted in the divestiture of the acquisitions of the fourth, fifth and sixth largest ready-mixed companies. It is as part of this response that the Commission also attacks the instant acquisition.

This trend towards vertical integration has made it quite difficult for non-integrated firms to compete even apart from open-market foreclosure. A vertically integrated cement and ready-mix company has decisive cost advantages over non-integrated competitors. Cement manufacturers are burdened with high fixed costs, as well as significant marketing, shipping and distribution costs. Vertical integration creates a more assured level of plant utilization, an elimination of any significant sales and marketing expenses to ones' own ready-mix subsidiary, and the ability to integrate the storage and distribution facilities of the cement and ready-mix company into a single urban terminal. All of these factors work to lower overall unit costs of integrated vis-a-vis non-integrated concerns.

However, while unit costs might be used to lower the price of cement to customers generally, they also have the potential of being used as weapons of economic discipline.[26] This is particularly true when an industry is tending towards oligopoly. In such markets, the handful of leading vertically integrated firms do not engage in general price cutting. Price cuts are used as a more selective instrument: to punish an aggressive marketeer or price-cutter of cement; to woo away a crucial account of a non-integrated concern; or to maintain respective oligopoly shares. United States v. Wilson Sporting Goods, 288 F.Supp. 543, 556–557 (NDIll.1968). The "mixed threat and lure of reciprocal buying" was the potential anticompetitive device which condemned the acquisition of Gentry, Inc. by Consolidated Foods. Federal Trade Commission v. Consolidated Foods, supra, 380 U.S. at 593–595, 85 S.Ct. 1220, 14 L.Ed.2d 95. Similarly, in the concentrating cement and concrete industries, the decisive cost factors of vertical integration create a "mixed threat and lure:" a "threat" insofar as the non-integrated firms must remain well-behaved or suffer the consequences; and a "lure" in that the well-behaved firms will not be subject to serious price-cutting. Such market conditions push the remaining non-integrated firms toward vertical integration.

Further, the sheer size and financial resources of U.S. Steel visit non-competitive

---

25. Immediately after the U. S. Steel acquisition, nearly two-thirds (66.3 per cent) of cement sales to ready-mixed firms were foreclosed from the open-market by vertical integration. Remaining non-integrated competitors of U.A.C. were forced to seek cement sales among the bare one-third of the original market left open for competition on the basis of price, quality and service. Colonial Sand and Stone, the largest producer and customer of portland cement, vertically integrated in 1958. Subsequently, the second, fourth, fifth and sixth largest customers of portland cement were acquired by cement companies. Other major cement companies and ready-mix operations have found that they must vertically integrate to stay in business.

26. The unsupported possibility of lower prices can not immunize this acquisition. As the United States Supreme Court held in FTC v. Procter & Gamble Co., "[p]ossible economies cannot be used as a defense to illegality." 386 U.S. 568 at 580, 87 S.Ct. 1224 at 1231, 18 L.Ed.2d 303.

stabilizing forces upon the competitors of Certified and U.A.C. U.S. Steel has the capacity to extend its credit and resources to aid either U.A.C. or Certified in gaining a particular job. It has extensive financial and personal contacts throughout the building industry. No other cement or ready-mix company is in any position to compete with U.S. Steel's ability to extend credit,[27] to exploit allied personal and financial ties in the building industry, to maintain and capture the accounts of others in the event of slackened demand, or to withstand temporary losses. Several courts have recently commented on the presence of such a large industrial factor in a concentrating industry. In F.T.C. v. Procter & Gamble Co., the United States Supreme Court observed:

> "There is every reason to assume that the smaller firms would become more cautious in competing due to their fear of retaliation by Procter. It is probable that Procter would become the price leader and that oligopoly would become more rigid." 386 U.S. at 578, 87 S.Ct. at 1230.

The existence of such "adverse psychological effects * * * on smaller rivals" was a key basis of the Government's successful opposition to the acquisition of Nissen Corporation by Wilson Sporting Goods Company, a subsidiary of Ling-Tempco Vought, Inc. United States v. Wilson Sporting Goods Co., 288 F.Supp. 543, 556–557 (N.D.Ill.1968). See General Foods Corp. v. Federal Trade Commission, 386 F.2d 936, 945–946 (3d Cir. 1967); Reynolds Metals Co. v. Federal Trade Commission, 114 U.S. App.D.C. 2, 309 F.2d 223, 229–230 (1962), United States v. Aluminum Co. of America, 233 F.Supp. 718, 727–728 (E.D.Mo.1964).

We find that all of these facts taken together provide very substantial evidence for each of the Commission's findings that "the ability to non-integrated cement producers (to compete) may be substantially impaired," that the "Respondent U.S. Steel may have achieved a decisive competitive advantage over its competitors," and that the "trend towards vertical concentration in the production and sale of cement and concrete has been aggravated" as a result of the instant acquisition.

**Barriers to Entry.** The Commission also found that, as a result of the acquisition, "new sellers of portland cement and ready-mixed concrete may be inhibited or prevented" from entering the industry.

Any substantial new barrier to entry into a market enhances the market power of existing firms and intensifies their ability to wield oligopolistic and anticompetitive practices with relative impunity. The raising of such barriers may be an important element in maintaining competition. Federal Trade Commission v. Procter & Gamble Co., supra, 386 U.S. at 578–581, 87 S.Ct. 1224; United States v. Penn-Olin Co., 378 U.S. 158, 173–174, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964).

Even prior to the acquisition of Certified, barriers to entry in the cement industry were "formidable." The only successful entrant to the Northeastern market for cement in recent years, Atlantic Cement, had to invest some $64 million to achieve initial access. Further, it ultimately was forced to extend its efforts outside of the large urban NYMA market because there were insufficient customers to maintain its distribution within the metropolitan area. For the Northeastern market as a whole, 70.8 per cent of that market was dominated by eight sellers. Subsequent to the acquisition, a majority of that segment was vertically integrated. There remains very little of the market for any new cement firm to seek as outlets for its product.

---

**27.** The very acquisition of Certified through the extension of such credit is witness to this fact. See Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 506, 89 S.Ct. 1252, 22 L. Ed.2d 495 (1969).

The barriers to entry in the concentrating and integrating ready-mix industry are also quite significant. Unless one seeks to become a "gypsy" operator, a prospective manufacturer of ready-mix concrete must expect to spend between three to five million dollars in initial capital requirements. In addition, the new entrant would face a market with a single vertically integrated competitor enjoying over one-half the market and the leading four sellers dominating 73.6 per cent of the total sales within the NYMA.

As a result of the U.S. Steel-Certified alliance, the barriers to entry in both the cement and concrete industries were stiffened. Immediately after the merger, nearly one-half of the entire cement market and two-thirds of cement sales to ready-mix concrete producers were foreclosed by three vertically integrated concerns. A prospective entrant to the cement industry must assume the risk of competing for the business of the remaining one-half of the cement market's demands and one-third of the ready-mixers' demands not already foreclosed. Further, such an entrant must run the risk that unless he vertically integrates, he may lose his customers either to the competitively stronger vertically integrated concerns or through their integration into a cement company. Similarly, a ready-mix entrant must either ante up the additional capital to vertically integrate or face a number of increased market perils. These include a possible reliance on suppliers from a vertically integrated firm with whom he is also competing at the ready-mix level; the greater ability of integrated concerns to absorb loss business at the ready-mix level to maintain high utilization of plant equipment and cover the fixed costs of their cement facilities; the ability of integrated concerns to use a "price-squeeze" to obtain any particular job in times when there is a supply shortage in the cement industry; and the psychological "fears" of smaller rivals competing with large integrated concerns. Federal Trade Commission v. Procter & Gamble Co., *supra*, 386 U.S. at 578, 87 S.Ct. 1224, 18 L.Ed.2d 303.

We find, therefore, substantial evidence to support the Commission's finding that the acquisition will tend to unduly raise barriers to entry in certain markets in the cement and concrete industries.

Having reviewed six functional indicia of the competitiveness of a vertical alliance and having found very substantial evidence to support the findings of the Commission with regard to each of these factors, we uphold the Commission's determination that the effect of the instant acquisition "may be substantially to lessen competition."

### III.  FAILING COMPANY DEFENSES

We turn now to U.S. Steel's assertion of "failing company" defenses. On the basis of the Commission's findings,[28] U.S. Steel contends that the failing character of Certified exempts the acquisition from the coverage of the Clayton Act § 7 on two grounds. First, U.S. Steel contends that—from an economic standpoint—the acquisition of a company that would have failed, but for its vertical integration, can not be anticompetitive in that the acquired company would have fallen from the market place.[29] Second, U.S. Steel contends that tion is completely immunized by the judicially created "failing company doc-

---

28. The Commission found "there was a reasonable probability of it [Certified's] failing within the near future" and there was a "lack of availability of [any] other purchasers." besides U. S. Steel.

29. From an economic standpoint—the acquisition of a failing company by a competitor or by a major supplier or customer may lessen competition. See Low, The Failing Company Doctrine: An Illusive Economic Defense Under Section 7 of the Clayton Act, 35 Ford L.Rev. 425 (1967); and Sotiriff, An Updating of the "Failing Company Doctrine in the Amended Section 7 Setting", 61 Mich.L.Rev. 566 (1963).

trine." International Shoe Co. v. F. T. C., 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930). We reject these two defenses.

First, we find substantial evidence to support the Commission's finding that the anticompetitive consequences in Certified's continued existence as a giant vertically integrated concern would deteriorate competitive conditions in the concrete and cement industry more than its elimination by business failure.

With regard to the cement industry, assuming Certified dropped from the market place,[30] its ready-mix business (and hence cement consumption) would be taken up by its competitors.[31] Correspondingly, those ready-mix producers would then order their additional cement requirements from various suppliers to the NYMA, creating a broad based demand for cement between the several suppliers in the Northeast. In contrast, Certified's acquisition by U.A.C. forecloses any open-market competition between cement suppliers for Certified's cement consumption.

Similarly, with regard to the ready-mix industry, the reduction of the number of ready-mix competitors by one may be far less anticompetitive than Certified's continued existence as a vertically integrated giant. As we have previously noted, the presence of a vertically integrated company in a concentrating industry serves to dampen the vigor of competition by non-integrated concerns. Also potential entrants, as well as non-integrated ready-mix producers, will be less likely to challenge the pricing practices of a concern with resources so many times larger than their resources as is the U.A.C.-Certified-U.S. Steel complex.

Second, U.S. Steel contends that the Commission's findings that Certified was in imminent danger of bankruptcy and that there was no other purchaser available except U.S. Steel, are two factual parameters which completely immunize the instant acquisition. The Commission, however, has taken the position that the "failing company doctrine" does not grant absolute immunity under section 7 where, in view of an acquisition's anticompetitive effects, the probable "harm to individuals" and "injury to the communities where its plants were operated" is not so serious that the consummation of the acquisition is in the "public interest."

In recent years the "failing company defense" has been subject to considerable academic discussion,[32] most of which has

---

30. While the Commission found that Certified was in "failing condition," it never made any assessments of how Certified would probably have fared in the variety of bankruptcy and reorganization alternatives which it had open to it. It is no longer a necessary consequence of bankruptcy, that the failing corporation liquidate all of its assets and disappear from the market place. Citizen Publishing Co. v. United States, 394 U.S. 131, 138, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969).

31. Had Certified dropped from the market place, the 9.8 per cent of the ready-mix production and cement consumption which it controlled would have gone to its competitors. The Commission found it was unlikely that Colonial would have taken the lion's share of Certified's former sales. Rather it found that Certified's smaller competitors in Nassau and Suffolk Counties would have taken up Certified's former clients. These competitors of Certified—being non-integrated—would bid for their incremental needs of cement on the basis of price, quality and service.

32. *Compare* Wiley, "The Failing Company": A Real Defense in Horizontal Merger Cases, 41 BUL Rev. 495, 511 *with* Bowman, the Impact of the "Failing Company" Doctrine. *See* Bok, Section 7 of the Clayton Act and the Mergering of Law and Economics, 74 Harv.L.Rev. 226, 340 (360) on the F.T.C.'s Premerger Clearance Program, 19 Syracuse L.Rev. 911, 932 (1968).

Administratively, this same conflict has occurred. Compare, Department of Justice Merger Guidelines, June 4, 1968 holding the failing company defense to be "absolute" *with* Occidental Petroleum Corp., 3 CCH Trade Regulation Rep. Par. 18,797 (June 10, 1969) Par. 18,864 (August 7, 1969) decision of Commission holding the failing company character of the company to be "balanced" against certain other factors. *See* Dean Foods Co., FTC DKT 8674 (1965067) CCH Trade

posed the very theoretical conflict which we have here—whether "failing company" status is to immunize an acquisition or is merely to be a factor to be weighed in determining whether the acquisition is in the "public interest."

We need not resolve this conflict because it is our belief that U.S. Steel has failed to prove the "ultimate facts material to the rule of International Shoe Co. v. Federal Trade Com'n, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930)," [33] approved by Congress, S.Hearings on H.R. 2734 at 115; 134–35, 198; 96 Cong.Rec. 16435, 16444; H.R.Rep.No.1191, 81st Cong. 1st Sess. at 6; S.Rep.No.1775, 81st Cong. 2nd Sess. at 7, and thereafter clarified by a series of United States Supreme Court cases culminating in the recent decision of Citizen Publishing Company v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969). Brown Shoe Co. v. United States, 370 U.S. 294, 319–320, 82 S.Ct. 1502, 8 L.Ed. 2d 510 (1962); United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed. 2d 176 (1962).

The United States Supreme Court first carved out the "failing company" defense to the antitrust laws in *International Shoe*. That case involved the acquisition of the McElwain Company, a manufacturer and distributor of shoes in several states, by the International Shoe Company, a nationally integrated manufacturer and distributor of shoes. At the time of the acquisition, the financial resources of the McElwain Company were "so depleted and the prospects of rehabilitation so remote" that the corporation was faced with "only [two] alternatives:" either liquidation of its assets through a receiver or an outright sale. The Court found that McElwain had no hope of ultimate recovery if "it * * * availed itself of a receivership" to continue as a going concern. 280 U.S. at 299, 301, 302, 50 S.Ct. at 92.[34] It was under these circumstances that the Court concluded:

> "[W]e hold that the purchase of its capital stock by a competitor (there being no other prospective purchaser), not with a purpose to lessen competition, but to facilitate the accumulated business of the purchaser and with the effect of mitigating seriously injurious consequences otherwise probable, is not in contemplation of law prejudicial to the public and does not substantially lessen competition or restrain commerce within the intent of the Clayton Act." 280 U.S. at 302, 50 S.Ct. at 93.

Twenty years later, in 1950, while reporting on the Celler-Kefaufer amendments to the Clayton Act, both houses of Congress expressed an intention to preserve the failing company defense established in International Shoe.[35] Indeed, since the effect of those amendments was to broaden the sweep of the Clayton Act § 7 to include acquisitions which lessened competition "in any line of commerce," rather than merely "between" two companies, Congress ostensibly approved an extension of the failing company doctrine to vertical, product extension, and conglomerate acquisitions, in addition to the horizontal-type acquisi-

---

Reg. Rep. Par. 17,765 (1966); Pillsbury Mills, Inc., 57 FTC 1274, 1409 (1960). *See also* Erie Sand & Gravel Co. v. FTC, 291 F.2d 279, 280–281 (3rd Cir. 1961).

33. United States v. Diebold, Inc., 369 U.S. 654 at 655, 82 S.Ct. 993 at 994, 8 L.Ed. 2d 176.

34. That the majority was convinced that there was no realistic hope for McElwain under receivership or reorganization is indicated by the dissent of Mr. Justice Stone, Mr. Justice Holmes and Mr. Justice Brandeis:

> "Nor am I able to say that the McElwain Company, * * * was then in such financial straits as to preclude the reasonable inference by the Commission that its business conducted either through a receivership or a reorganized company, would probably continue to compete with that of petitioner." 280 U.S. at 306, 50 S.Ct. at 94.

35. H.R.Rep. No. 1191, 81st Cong. 1st Sess. at 6; S.Rep. No. 1775, 81st Cong., 2nd Sess. at 7.

608

tion which took place in *International Shoe.*[36]

Twelve years later, in 1962, the United States Supreme Court affirmed the applicability of the "failing company doctrine" to horizontal, United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), and vertical mergers, Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) under the amended Clayton Act § 7. 15 U.S.C. § 18 (1964).

Not until 1969 in Citizen Publishing Co. v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969), did the United States Supreme Court give any extended consideration[37] to the "failing company doctrine." *Citizens Publishing* involves a joint operating agreement and stock purchase between a healthy and a failing newspaper in Tucson, Arizona, which the Government attacked, in part, as being violative of Section 7. The District Court required the newspapers to submit a plan for divesture and re-establishment of independent competition.

In affirming the District Court, the United States Supreme Court entered into a full discussion of the "ultimate facts material," United States v. Diebold, Inc.,

369 U.S. at 655, 82 S.Ct. at 994, to a determination of whether "the conditions of the failing company doctrine have been satisfied * * * [by] those who seek refuge under it." The Court emphasized the "present narrow scope," 394 U.S. at 139, 89 S.Ct. 927, of the doctrine and clarified the "requirements" of the defense. First, the evidence must show that the financial condition and resources of the company are so dire that "it faced the grave probability of a business failure." 394 U.S. at 137, 89 S.Ct. at 930. Second, there can be "no other prospective purchaser." 394 U.S. at 137, 89 S.Ct. 927. Finally, the Court observed that the prospects of the acquired company emerging from reorganization as a competitive unit must be "dim or non-existent."[38] 394 U.S. at 138, 89 S.Ct. 927.

This third requirement was implicit in the holding of *International Shoe.* The facts of *International Shoe* reveal that the majority dismissed McElwain's hope of ultimate recovery as a competitive unit through receivership "as lying wholly within the realm of speculation," 280 U.S. at 301, 50 S.Ct. at 92. A reading of the dissent of Mr. Justice Stone, concurred in by Mr. Justice Brandeis

---

**36.** Most commentators agree that Congress intended to carry the failing company defense into the amended Section 7: *Comment*, 61 Mich.L.Rev. 566, 571 (1963); Wiley, The "Failing Company"; A Real Defense in Horizontal Merger Cases, 41 B.U.L.Rev. 495, 502 (1961); Low, The Failing Company Doctrine: An Illusive Economic Defense Under Section 7 of the Clayton Act, 35 Fordham L.Rev. 425, 426–27 (1967); Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv.L.Rev. 226, 339 (1960). *See* Brown Shoe Co. v. United States, 370 U.S. at 319–320, 82 S.Ct. 1502. *But see*, Citizen Publishing Co. v. United States, 394 U.S. at 136 n. 3, 89 S.Ct. 927.

**37.** Passing consideration is made of the doctrine in United States v. Third National Bank, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968); United States v. Philadelphia Nat. Bank, 374 U.S. 321, 372 n. 46, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); United States v. Von's Grocery

Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L. Ed.2d 555 (1966); United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964).

**38.** This third requirement may be read as unnecessary to the Court's disposition of the case. It was, however, clearly intended by the Court to clarify the confines of the "present narrow scope" of the failing company doctrine. The Court observed:

"Moreover, we know from the broad experience of the business community since 1930, the year when the *International Shoe* case was decided, that companies reorganized through receivership, or through Chapter X or Chapter XI of the Bankruptcy Act often emerged as strong competitive companies. The prospects of reorganization of the Citizen in 1940 would have had to be dim or nonexistent to make the failing company doctrine applicable to this case." 394 U.S. at 138, 89 S.Ct. at 931.

and Mr. Justice Holmes, fortifies the inference that the majority found no "reasonable inference * * * that its [McElwain's] business, conducted either through a receivership or a reorganized company, would probably continue to compete, * * *" 280 U.S. at 306, 50 S.Ct. at 94. Further, the briefs of the parties reveal that whether McElwain could have passed through bankruptcy or receivership and emerged as a going concern was an issue before the Court.[39] The langauge of *Citizen Publishing* that the prospects of the acquired company surviving as a competitive unit through bankruptcy receivership or reorganization proceedings must be "dim or nonexistent" has its origin in the "ultimate facts material" to *International Shoe*. We may fairly infer from the Court's holding in *International Shoe* the "failing company doctrine" would not have applied to McElwain had the prospects for going through receivership not been "wholly speculative."

*Citizen Publishing* has clarified this inference. It has emphasized that the failing company doctrine must be considered in terms of today's economic environment for companies facing bankruptcy. It has observed that "we know from broad experience * * * since 1930, * * * that companies reorganized through receivership or through Chapter X or Chapter XI of the Bankruptcy Act often [emerge] as strong competitive companies," 394 U.S. at 138, 89 S.Ct. at 931. It has placed the burden of "proving the conditions of the failing company doctrine * * * on those who seek refuge under it." 394 U.S. at 138–139, 89 S.Ct. at 931.

■ Turning to the facts of the instant acquisition, U.S. Steel and the Commission have devoted insufficient consideration to the prospects of reorganizing Certified into a vital, competitive company. The record, however, is replete with evidence on the subject. United States Steel paid over a million dollars to the equity interests of Certified, after assuming all liabilities. Further, the record indicates that Certified was created by the tying together of a number of ready-mix concrete and building aggregate companies primarily serving the NYMA, each of which had created a certain amount of goodwill. Also, Certified had an expanding sales organization, an aggressive reputation in marketing and long-term contract commitments. Each of these facts suggest the possibility that Certified may have been split into several going concern packages in a receivership proceeding. Clearly, the creation of any such going concern packages might well eliminate the vertical foreclosure of cement purchasing and intimidation towards competitors that inheres in the insant vertical integration. In any event, U.S. Steel has failed to satisfy its burden of proving that the facts of this case make Certified's opportunity for some form of continued competitive vitality through bankruptcy or similar proceedings to be "dim or non-existent."

We find that there is very substantial evidence of the anticompetitive effects and tendencies of the instant acquisition and that U.S. Steel has failed to satisfy the "ultimate facts material" to the "present narrow scope" of the failing company doctrine. Recognizing that Citizen Publishing Co. v. United States, 394 U.S. 131, 138, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969) was decided subsequent to the Federal Trade Commission's disposition of the instant case, it is appropriate to remand this case to give U.S. Steel an opportunity to bring forth evidence that the prospects of Certified passing through bankruptcy or similar proceedings were "dim or non-existent." Similarly, the Commission will be in a posi-

---

**39.** The Government's brief in *International Shoe* argues that "Such proof, however, is essential to a showing 'that the failing company doctrine is applicable.' It continues to state, 'it is a matter of common knowledge that many large and successful industrial concerns, as well as, numerous railroads have at one time or another passed through receivership.'" Government's brief at 23–24.

tion on remand to make a finding of fact as to this crucial element in the failing company defense.

Moreover, upon remand we believe the Commission should reassess the standards by which the actions and defenses of United States Steel Company are to be judged. While the instant acquisition was consummated on April 30, 1964, the record reveals that U.S. Steel-Certified vertical ties may have taken an unlawful cast as early as January 1963. If such vertical ties were unlawful, then the failing character of Certified must be shown to have existed at that time. Citizen Publishing Co. v. United States, 394 U.S. 131, 133, 140–142, 89 S.Ct. 927, 22 L.Ed. 2d 148 (The failing character of the Company was measured from 1940 at which time the first joint operating agreement was effected, rather than from 1953 at which time the challenged agreement was effected.)

In January, 1963, U.S. Steel entered a "notes purchase agreement" with Bankers Trust Company which enabled Certified to obtain a large sum of money beyond its needs to pay U.S. Steel for its cement supplies. Apparently U.S. Steel and Certified participated in this three party agreement with the tacit understanding and expectation that Certified would receive a large loan at exceptionally favorable interest rates in return for which Certified would purchase a very substantial portion of its future cement supplies from U.S. Steel. The effect of such an agreement may very well have been the use of credit, as a lever, to unreasonably restrain or induce Certified from purchasing its cement needs for a significant period of time on the open market. Such an arrangement, and its accompanying effects, may well be unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1 (1964), Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), the Federal Trade Commission Act § 5, 15 U.S.C. § 45(a) (1964), Hastings Mfg. Co. v. Federal Trade Commission, 153 F.2d 253, 256–257 (6th Cir. 1946), and the Clayton

Act § 3, 15 U.S.C. § 14 (1964), see Curly's Dairy, Inc. v. Dairy Cooperative Association, 202 F.Supp. 481, 484–485 (D.Ore.1962); Oral Argument before Trial Examiner, Record at 1259–60.

To the extent that unreasonable foreclosure of Certified's cement demands occurred as a result of the financial arrangement in January, 1963, we believe that the failing company defense must be measured from the inception of these unreasonable vertical arrangements, not from the point of their final consummation.

This matter is remanded to the Federal Trade Commission for findings of fact and further proceedings consistent with this opinion. Upon remand the Commission may consider any evidence previously taken and now on file and such additional evidence on any issue raised by the complaint as may be admissible and relevant to such issues. Any party shall be accorded the right to require the presence of any previously sworn witness for additional testimony either on direct or cross-examination.