**UNITED STATES of America, Plaintiff,**

**v.**

**M.P.M., INC., and Pre-Mix Concrete, Inc., Defendants.**

**Civ. A. No. C–3917.**

United States District Court, D. Colorado.

April 25, 1975.

John E. Sarbaugh, John L. Burley, James W. Ritt, Allen B. Wagner, Dept. of Justice, Chicago, Ill., for plaintiff.

Dayton Denious, Edward T. Able, Jr., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

FINESILVER, District Judge.

The Government commenced this action pursuant to 15 U.S.C.A. § 25 (1948) [Clayton Act], challenging the acquisition by defendant M.P.M., Inc., [MPM] of two formerly independent ready-mix concrete firms, Mobile Con-

crete, Inc. [Mobile] and Pre-Mix Concrete, Inc. [Pre-Mix], and the subsequent corporate merger of the firms as violative of Section 7 of the Clayton Act, 15 U.S.C.A. § 18 (1950). The Government seeks divestiture of the acquisition and merger and injunctive relief to prevent defendants from acquiring similar companies in the future.

The several pivotal issues in this litigation are: (1) Do the facts of this case satisfy the "engaged in commerce" jurisdictional requirement? (2) Is ready-mix concrete a "line of commerce" within the meaning of the Clayton Act? (3) What geographical area comprises the appropriate "section of the country" for purposes of this action? (4) Was Mobile a "failing company" in the sense which will avoid the strictures of the Clayton Act? (5) Did the acquisition and/or the merger complained of result in a substantial lessening of competition or tend to create a monopoly? Finally, (6) Are certain equitable and constitutional defenses available to defendants under the facts peculiar to this case which defeat plaintiff's attempt to apply the Clayton Act to them?

In this opinion, we consider in detail each of the contentions of the litigants.[1] For the reasons articulated below, we find in favor of the defendants. The parties have been previously notified of this result in our Preliminary Order of January 27, 1975.

## I. BACKGROUND

For an overview of this case, we recite the following uncontroverted facts and chronology of events.

During the pertinent times, Mobile was engaged in the production and sale of ready-mix concrete in the Denver metropolitan area.[2]

---

1. The necessity to detail our findings explicitly in a case of this type is mandated by the Supreme Court. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 2866–67 n. 13, 41 L.Ed.2d 1016 (1974).

2. Pretrial Order Number One § 5(B), Uncontroverted Facts, at 4. *Hereinafter* referred to in text as "P/T 1 at ——."

For approximately 15 years prior to June 1, 1967, Mobile was principally owned by Robert Anderson.[3]

On June 1, 1967, Mobile was purchased by Meade, Boothby, and Fulenwider (Meade at 272–74). Meade became the majority (57%) stockholder and active company manager. Boothby and Fulenwider each held 21½% of the stock (Meade at 272–74 & 315–16; Boothby at 717–18).

Prior to June 12, 1970, defendant Pre-Mix was engaged in the production and sale of ready-mix concrete in the Denver metropolitan area (P/T 1 at 4). During this period it was owned by M. E. Moore, MEMCO Corp., and Texas Industries, Inc. (P/T 1 at 9).

On May 29, 1970, defendant MPM was incorporated under the laws of the state of Colorado. It functioned as a holding company with Meade and Boothby as the sole stockholders (Meade at 306–07).

Thereafter, on June 12, 1970, MPM acquired all of the outstanding common stock of both Mobile and Pre-Mix (P/T 1 at 4) and commenced joint operation of the two companies.

Pursuant to Colorado statutory law, on November 12, 1971, Pre-Mix, Mobile and Mobile Concrete of Colorado Springs, Colorado (an off-shoot of Mobile, Meade at 276–78) merged under the name of Pre-Mix.

Plaintiff filed the present action in 1972, claiming a violation of § 7 of the Clayton Act. The Government contends that the violation consisted of the acquisition by MPM of all of the outstanding common stock of two formerly independent ready-mix companies and the merger of Mobile and Pre-Mix. These activities, the Government alleges, substantially lessened competition or tended to cause a monopoly in the ready-mix concrete industry within the Denver metropolitan area (designated to include four counties: Denver, Adams, Arapahoe, and Jefferson).

Market sales figures for the Denver metropolitan area ready-mix concrete industry demonstrate that for the year 1969 Pre-Mix was the third largest producer and seller of ready-mix in this area with a market share of 16.5% (Appendix I).[4] Mobile was the fourth largest producer and seller with a 14.8% share of the market during the same period (Appendix I). In 1970—the year in which MPM acquired the stock of the two companies and began operation of them on a joint basis—the combined sales of Mobile and Pre-Mix aggregated 31.6% of the ready-mix concrete market in the four-county area, making this corporate combination the largest single producer and seller of ready-mix concrete in metropolitan Denver (Appendix I).

## II. "ENGAGED IN COMMERCE" REQUIREMENT

■ Federal courts have jurisdiction to "prevent and restrain violations" of the Clayton Act. 15 U.S.C.A. § 25 (1948). Activity constituting a "violation" of the Act is defined in 15 U.S.C.A. § 18 (1950). This statute, *inter alia,* provides:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part

---

3. Trial Transcript at 271. *Hereinafter* references to the Trial Transcript in text will be by witness name and transcript page number: *e. g.,* "Meade at 271."

4. Appendix I contains, in dollar amounts and percentage shares, sales figures for the years 1969 and 1970 for *all* ready-mix concrete firms located in the following Colorado counties:

Denver, Adams, Arapahoe, Jefferson, Boulder, and Douglas. The parties agreed that the information should be confidential and therefore submitted it in a sealed envelope. We wish to maintain its confidentiality and therefore include it in this opinion in a sealed envelope for the use of this Court, the Supreme Court, and the parties only.

of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

For our purposes, the term "commerce" means "trade or commerce among the several States . . . ." 15 U.S.C.A. § 12 (1914). For a violation of the Clayton Act to occur, both the acquiring and the acquired companies in a merger case must be engaged in interstate commerce.

There is no question in this case but that all sales of ready-mix concrete by both Mobile and Pre-Mix were and continue to be solely intrastate—they sell no product outside of the state of Colorado.

The Government contends, however, that the interstate commerce jurisdictional requirement is met because both companies purchase substantial amounts of cement necessary for the production of ready-mix concrete from out-of-state suppliers. Data from the year 1969 is relied on in support of this allegation (GX 22).

Defendants counter with two arguments. First, they maintain that since early 1970 (two years prior to the April 11, 1972, filing of this action) Mobile and Pre-Mix obtained all but 4% of their cement requirements from suppliers located within Colorado. This amount, they argue, is *de minimis* and therefore insufficient basis upon which to posit jurisdiction in the present action. Second, they contend that even if such amount is not considered *di minimis*, jurisdiction cannot attach because production and sale of ready-mix concrete is purely a local business activity, and Sherman Act cases are inapposite in a § 7 Clayton Act suit—*i. e.*, even if defendants do purchase essential ingredients from foreign suppliers and are thus within the flow of commerce, such fact is of no avail to a plaintiff in a Clayton Act prosecution.

Serious questions are thus raised as to our power to entertain this suit.

Cement is an essential ingredient of concrete (GX 22, para. 14; Thurman at 234 & 236) and is produced by grinding and heating limestone with additives (GX 16 at 6; Berkey at 33–34). Ordinarily, cement is shipped from production plants to concrete-producing customers on a daily basis by truck and rail (Barnes at 44–45; Smith at 59; GX 17 at 30; GX 18). Ready-mix companies blend the cement with other ingredients (sand, gravel, additives, and water) to make concrete (GX 17 at 4–5; GX 16 at 13; GX 15 at 17). Ready-mix concrete is delivered to the customer's job site in a plastic, viscous state and poured from mobile trucks into building forms in which the concrete subsequently hardens through the hydration process (Brown at 73).

The Government's evidence demonstrates that during the year 1969 both Mobile and Pre-Mix bought substantial amounts of their cement requirements from out-of-state suppliers and purchased, respectively, 56% and 53% of the necessary cement from sources located outside Colorado (P/T 1 at 7; GX 22) (percentages computed from figures given in these sources). These facts are undisputed.

Also undisputed, however, is the fact that early in 1970 the Martin Marietta company (a prime supplier of both defendants) opened a new cement production facility in Lyons, Colorado (Barnes at 47). Prior to that time, the cement supplied by Martin Marietta to Mobile and Pre-Mix originated from Tulsa, Oklahoma (P/T 1 at 7; GX 22, para 11). Defendants assert—as a result of this change in source of supply—that as of the time of the allegedly unlawful stock acquisition (June 12, 1970) only a small amount (4%) of the combined cement requirements of Mobile and Pre-Mix was being purchased from non-Colorado suppliers. We note that although this assertion was made several times by the defendants in pre- and post-trial plead-

ings, nothing was offered by defendants in the way of exhibits or testimony to substantiate this statement in the record other than the fact that after early 1970, all Martin Marietta cement came from Colorado and not Oklahoma (Barnes at 47). The Government offered no post-1969 data with respect to cement purchases by defendants. However, neither did the defendants. Thus we need not consider the issue of whether purchase of ingredients in the amount of 4% is *di minimis.*

■ Since it is uncontroverted that neither defendant in this action effectuates sales of ready-mix concrete across state lines, determination of the jurisdictional question depends upon the resolution of the following issue. Can the fact that a defendant in a § 7 Clayton Act suit uses ingredients purchased across state lines for the production of a product sold exclusively intrastate satisfy the "in commerce" jurisdictional requirement? We think that this question should be answered in the affirmative.

■ Initially, we note that cases arising under the Robinson-Patman Act, 15 U.S.C.A. § 13 (1936), have uniformly held that at least one interstate sale is required before jurisdiction under that statute can attach. *See, e. g., Belliston v. Texaco, Inc.,* 455 F.2d 175 (10th Cir. 1972), *cert. denied,* 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972). The movement of ingredients of a product across state lines cannot confer jurisdiction under that Act when sales are exclusively intrastate. *Id.; Scranton Construction Co. Inc. v. Litton Industries Leasing Corp.,* 494 F.2d 778 (5th Cir. 1974), *U.S. appeal pending.*

■ The present action, however, arises under § 7 of the Clayton Act anti-merger provisions and not under the price discrimination provisions of the Robinson-Patman Act. In cases arising under the former, courts have construed the "in commerce" requirement to be synonymous with the commerce requirement under the Sherman Act, 15

U.S.C.A. § 1 *et seq.* (1955), as commonly interpreted by the courts. In such cases, the movement of mere ingredients across state lines can suffice as a jurisdictional basis. *See, e. g., United States v. South Florida Asphalt Co.,* 329 F.2d 860 (5th Cir. 1964); *Hardrives Co. v. East Coast Asphalt Co.,* 329 F.2d 868 (5th Cir. 1964). Furthermore, Sherman Act jurisdiction may be properly premised upon purely local activities which have a substantial effect on interstate commerce. *See, e.,g., Mandeville Island Farms, Inc. v. American Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948).

The following cases offer support for the proposition that the jurisdictional requirements under § 7 of the Clayton Act and the Sherman Act are substantially equivalent. *Standard Oil Co. v. United States,* 337 U.S. 293, 314–15, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); *Transamerica Corp. v. Board of Governors,* 206 F.2d 163, 166 (3d Cir. 1953), *cert. denied,* 346 U.S. 901, 74 S.Ct. 225, 98 L.Ed. 401 (1953); *cf. United States v. Grinnell Corp.,* 384 U.S. 563, 573, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

The precedential value of these cases remains fully viable despite the recent case of *Gulf Oil Corp. v. Copp Paving Co., Inc.,* 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). We do not regard *Copp* directly dispositive of a contrary result in the present action. First, in that case, the products sold by the companies involved was "made wholly from components produced and purchased intrastate." 95 S.Ct. at 397. The instant action, on the other hand, involves companies which purchased ingredients from foreign suppliers. Second, although the Supreme Court in *Copp* expressed some doubt as to whether the reach of § 7 of the Clayton Act should be coextensive with that of the Sherman Act, it did not so decide because the case did "not present an occasion to decide the question." 95 S.Ct. at 402. Third, the plaintiff in the present suit, unlike the *Copp* plaintiffs, did not rely on a "nexus"

theory of jurisdiction or the affectation doctrine. Rather, the Government rests its jurisdictional argument on the fact that the defendants' activities are within the flow of commerce due to the fact that some part of the product's essential ingredient (cement) has a point of origin from a place outside of the state of Colorado where all ultimate sales take place. *See United States v. Richter Concrete Corp.*, 328 F.Supp. 1061 (S.D. Ohio 1971).

■ In view of the preceding discussion, we hold that the defendants herein were engaged in commerce within the meaning of § 7 of the Clayton Act in view of the fact that an essential component of their product was in the flow of commerce.[5]

## III. *"LINE OF COMMERCE"*

■ Competition is the essential concern of the antitrust laws. Thus, prior to considering whether a challenged merger may have a proscribed effect on competition, it is necessary to define the market with respect to which the competition may be said to exist:

> "[d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition 'within the area of effective competition.' Substantiality can be determined only in terms of the market affected."

*Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L. Ed.2d 510 (1962), *quoting from United States v. E. I. duPont de Nemours & Co.*, 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed. 2d 1057 (1957). "Unless we know where to look, in other words, we cannot know what effect the merger will have or how substantial that effect will be." Kintner, *Primer on the Law of Mergers* at 221 (1973).

■ The "relevant market" concept entails two separate dimensions: (1) the product market or "line of commerce," and; (2) the geographical market or "section of the country." *Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co.*, 293 U.S. 268, 279, 55 S.Ct. 182, 79 L.Ed. 356 (1934).

At issue in this case is whether ready-mix concrete is a product market or "line of commerce" with regard to which there is competition of a nature protectible by a Clayton Act suit. Defendants maintain that ready-mix concrete is not the relevant product market in this action but that the sphere of competition must also include other construction materials such as brick, steel, wood, and especially, prefabricated concrete (precast and/or prestressed). In *Brown Shoe, supra*, 370 U.S. at 325, 82 S.Ct. at 1523, the Court stated that:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.

In support of their argument for a product market broader than that postulated by the Government, defendants point to the interchangeable uses and cross-elasticity of demand for construction materials. They contend that since substitutes for ready-mix concrete are available then such materials must be considered to be in competition with it. Defendants find authoritative, by analogy, *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), in which the Court left undisturbed a district court finding that the relevant product market was the energy market as a whole—not just coal. We find defendants' attempt to expand the product market from ready-mix concrete to construction materials, in general, unpersuasive.

■ Case law suggests several criteria against which the facts of a parti-

---

5. Parenthetically, we observe that even if the 4% figure were established by credible evi-

dence we would not regard it as *di minimis* for jurisdictional purposes.

cular case can be measured. These include the following "practical indicia":

[1] industry or public recognition of the submarket as a separate economic entity, [2] the product's peculiar characteristics and uses, [3] unique production facilities, [4] distinct customers, [5] distinct prices, [6] sensitivity to price changes, and [7] specialized vendors.

*Brown Shoe, supra,* 370 U.S. at 325, 82 S.Ct. at 1524 (citation and footnote omitted) (bracketed numbers added).

■ Comparing the evidence presented at trial to the *Brown* criteria, we find that ready-mix concrete is a proper "line of commerce" within the meaning of the Clayton Act.

We do not view defendants' reliance on *General Dynamics, supra,* as persuasive of a contrary finding. First, the analogy defendants would have us accept (that coal is to the energy market as ready-mix concrete is to the construction materials market) misses the mark for the reason that ready-mix concrete has peculiar characteristics which render it, as a practical matter, exclusively appropriate for some uses. Second, the Court did not, in *General Dynamics,* pass on the question of the relevant product market but affirmed the district court's decision against the Government on the basis of that court's reliance on the scarcity of usable coal reserves as the primary basis for its disposition of the case. *General Dynamics, supra,* 415 U.S. at 510, 94 S.Ct. 1186.

The evidence adduced at trial satisfies the parameters of the relevant product market enunciated in *Brown* and related cases. Certainly, the building industry recognizes ready-mix concrete producers as comprising a separate economic entity within the construction trade. Indicative of this recognition is the fact that trade associations consisting only of ready-mix concrete companies have been formed to promote use of their product (Smith at 67; Thurman at 320). Further evidence that ready-mix concrete is recognized as a distinct product is in-dicated by its assignment of a standard industrial classification code (DX HH at 141; Peterson at 641–42). Production facilities of ready-mix concrete may be utilized only for the production of ready-mix concrete and for no other purpose (Morton at 145; Meade Deposition at 18–19). No Denver ready-mix firms have significant sales of materials other than ready-mix concrete (Boothby Deposition at 21–25). Delivery equipment is equally specialized; ready-mix concrete trucks are not suitable for any purpose other than the delivery of ready-mix concrete. These specially designed large vehicles are expensive and constitute a high proportion of the capital investment in a ready-mix company.

Ready-mix concrete is unique among construction materials to the extent that it is the only practicable material for some building purposes. Unlike other construction materials generally, ready-mix can be used to conform to any desired shape within practical structural design limitations (Brown at 73). It also has qualities of tremendous strength, durability, and fire resistance upon hardening (Brown at 73; Buchanan at 108). The testimony indicated that building contractors extensively use only ready-mix concrete for the following construction purposes: foundations (Brown at 72–73 & 75; Curtiss at 124); footings (Buchanan at 109; Curtiss at 124; Yordan at 178; Thurman at 253–54); floor slabs (Brown at 75; Buchanan at 108; Yordan at 178); sidewalks, curbs, and gutters (Brown at 75; Buchanan at 108–09; Morton at 147–48; Yordan at 178; Thurman at 254–55). In sum, with few exceptions, ready-mix concrete is used in some phase of the construction of all modern buildings (Smith at 69).

In view of the persuasive evidence outlined above (*see also* Yordan at 174; McNown at 749–55), we conclude that defendants' objection to plaintiff's characterization of ready-mix concrete as a "line of commerce" as defined in the Clayton Act has no basis in fact and is not in harmony with the economic or

functional reality of the construction industry.

Other courts faced with the question have reached a conclusion identical to that which we draw here—that ready-mix concrete is a proper "line of commerce" for Clayton Act purposes. *See, e. g., Mississippi River Corp. v. FTC,* 454 F.2d 1083 (8th Cir. 1972); *United States Steel Corp. v. FTC,* 426 F.2d 592 (6th Cir. 1970); *United States v. Richter Concrete Corp.,* 328 F.Supp. 1061 (S.D. Ohio 1971).

## IV. *"SECTION OF THE COUNTRY"*

The Clayton Act prohibits the combination of businesses:

. . . where in any line of commerce *in any section of the country,* the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C.A. § 18 (1950) (emphasis added). Preliminary to a determination of whether a violation of the Act has occurred, it is necessary to define the relevant "section of the country." *See, e.g., Brown Shoe, supra,* 370 U.S. at 324, 82 S.Ct. 1502.

For Section 7 purposes, "section of the country" is synonymous with the relevant geographical market which is defined "as the area in which the goods or services at issue are marketed to a significant degree by the acquired firm." *United States v. Marine Bancorporation, supra,* 94 S.Ct. at 2869.

"Section of the country" is not amenable to scientifically precise definition. Unquestionably, a certain amount of "fuzziness" is inherent in any attempt to delineate the required geographical boundaries in a Clayton Act suit. *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 360 n. 37, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). "Metes and bounds" descriptions cannot be realistically required. *United States v. Pabst Brewing Co.,* 384 U.S. 546, 549, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966). The Government does have a burden, however, "to come forward with evidence

delineating the rough approximation" of the geographical market in question. *United States v. Connecticut Nat'l Bank,* 418 U.S. 656, 94 S.Ct. 2788, 2796–97, 41 L.Ed.2d 1016 (1974). Political boundaries or Standard Metropolitan Statistical Areas may or may not suffice in a given case. *Id.* The burden which the plaintiff must discharge is best described as one which must meet a standard of "reasonable" or "rough approximation." *Id.; Marine Bancorporation, supra,* 94 S.Ct. at 2868.

In applying this standard, we are guided by these concepts:

Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both "correspond to the commercial realities" of the industry and be economically significant.

*Brown Shoe, supra,* 370 U.S. at 336–37, 82 S.Ct. at 1530. More specifically:

[T]he "area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, *and to which the purchaser can practicably turn for supplies."*

*Philadelphia Nat'l Bank, supra,* 374 U.S. at 359, 83 S.Ct. at 1739, *quoting from Tampa Electric Co. v. Nashville Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

Both firms with which we are concerned in this action marketed their product only in the near-north central eastern slope of the state of Colorado. At all times pertinent hereto, Mobile operated plants for the production of ready-mix concrete at five locations within the 4–county Denver metropolitan area, and Pre-Mix operated seven plants located in the same area (Appendix II). Thus all plants of both companies were located either in Denver or a contiguous county. We are therefore not concerned with a national, regional, or even a state-wide market. Rather, the market in

question is clearly centered around the City and County of Denver, Colorado. Neither party appears to dispute the fact that Denver must be regarded as the hub or axis of the relevant geograhical market. The parties do vigorously differ, however, with respect to the question of how far the market radiates outward from Denver.

The Government contends that the appropriate section of the country is limited to an area comprised of the following four counties: Denver, Adams, Arapahoe, and Jefferson (Appendix III). Defendants, on the other hand, maintain that the relevant geographical market must encompass a 10-county area along the Front Range of the Rocky Mountains. This area, in addition to the four counties proposed by the Government, includes the counties of: Larimer, Weld, Boulder, Douglas, El Paso, and Pueblo (Appendix III). Defendants thus contend that the sphere of ready-mix sales should extend along the eastern side of the mountains from an area north of Fort Collins, Colorado, to an area south of Pueblo, Colorado—a distance of some 300 miles.

In view of the nature of the product involved in this suit, we conclude that the "section of the country" conception offered by the defendants is overly and unrealistically expansive. We are persuaded by the evidence that the plaintiff satisfactorily met its burden as to this element of the case, and hold that the 4-county Denver metropolitan area (Denver, Adams, Arapahoe, and Jefferson counties) is the appropriate geographical market for purposes of this case.

A critical limiting factor with regard to the distribution and sale of ready-mix concrete is the effective delivery radius from the company's production plants. Concrete is an enormously heavy material, weighing almost two tons per cubic yard (Carter Deposition at 5-6 & 15). Obviously, the vehicles designed to transport it must be very large and expensive to operate. Since the concrete must be delivered in a viscous state, the delivery trucks must be equipped with a revolving storage drum. Delivery costs therefore are substantial and extremely significant in determining the price of the product. Transportation expenses present a formidable barrier to delivery of ready-mix concrete outside a relatively short distance from production plants (Yordan at 174-76). For the first six months of 1970, for example, the average *round* trip distance traveled by the delivery trucks of Mobile and Pre-Mix were, respectively, 14.01 and 17.38 miles (P/T 1 at 9). These figures suggest that the economically effective delivery radius for ready-mix concrete from the production facility is less than 10 miles.

Industry statistics indicate that of all of the ready-mix concrete sold in the Denver metropolitan area, only a *de minimis* amount was sold by companies located outside that area—.5% in 1969 and 0.0% in 1970 (Appendix I at A-2). Construction contractors invariably turn to firms located within the 4-county area for supply of projects situated in that area.

The above evidence demonstrates to our satisfaction that the delivery range for ready-mix concrete is limited to a relatively short distance from production plants. When this fact is coupled with the additional fact that all of the plants operated by Mobile and Pre-Mix were located within the 4-county area, we feel that the 4-county Denver metropolitan area must be considered a "reasonable approximation" of the relevant geographical area for purposes of this action.

We recognize that the 4-county area is perhaps not a totally self-contained competitive sphere in all particulars. There is, no doubt, some overlap of competition on the outer perimeters of this area between companies with plants located in the Denver metropolitan area and those located nearby, but outside of, the area. Such "fuzziness," however, cannot defeat the conclusion that the 4-county area substantially depicts the competitive arena pertinent to this suit.

## V. PROBABLE COMPETITIVE OR MONOPOLISTIC EFFECT

### A. Purposes of the Clayton Act

■ Section 7 of the Clayton Act prohibits mergers where in a relevant product and geographical market "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18 (1950). Deliberate choice of the word "may" in the preceding phrase indicates that Congress':

. . . concern was with probabilities, not certainties. Statutes existed for dealing with clear-cut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a probable anticompetitive effect were to be proscribed by this Act.

Brown Shoe, supra, 370 U.S. at 323, 82 S.Ct. at 1522. The Clayton Act provides "authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce [is] still in its incipiency." Id. at 317, 82 S. Ct. at 1520. For a given merger to be proscribed, however, more is required than a " 'mere possibility' of the prohibited restraint . . .. Probability of the proscribed evil is required." FTC v. Consolidated Foods, 380 U.S. 592, 598, 85 S.Ct. 1220, 1224, 14 L.Ed.2d 95 (1965).

■ Thus the Clayton Act is essentially preventive in nature. Congress intended that it be employable against mergers in a relevant market at a time when the trend toward concentration is merely incipient or a probability—as opposed to an accomplished fact or virtual certainty. Mergers which fall somewhere between the extremes of certain menace to competition and an ephemeral possibility of anticompetitive effect may be held violative of the Clayton Act.

■ With regard to a determination of effect on competition, "Congress indicated plainly that a merger had to be functionally viewed, in the context of its particular industry." Brown Shoe, supra, 370 U.S. at 321–22, 82 S.Ct. at 1522.

A functional view of the industrial context entails consideration of several factors:

That is, whether the consolidation was to take place in an industry [1] that was fragmented rather than concentrated [2] that had seen a recent trent toward domination by a few leaders or had remained fairly consistent in its distribution of market shares among the participating companies [3] that had experienced easy access to markets by suppliers and easy access to suppliers by buyers or had witnessed the ready entry of new competition or the erection of barriers to prospective entrants, all were aspects, varying in importance with the merger under consideration, which would properly be taken into account.

Brown Shoe, supra, at 322, 82 S.Ct. at 1522 (bracketed numbers added) (footnote omitted). Listing of these factors is but another way of saying that, in a § 7 suit, the Court must undertake analysis of the history and structure of the relevant market in order to assess meaningfully the probable effect on competition portended by a particular merger.

■ In cases, such as the one at hand, involving horizontal mergers, other factors deserve special attention:

[1] the relative size and number of the parties to the arrangement; [2] whether it [the merger] allocates shares of the market among the parties; [3] whether it fixes prices at which the parties will sell their product; or [4] whether it absorbs or insulates competitors.

Id. at 334–35, 82 S.Ct. at 1529 (footnote omitted). Objective criteria play an important role in making a § 7 predictive economic judgment. Such data, however, are but a point of departure in the Court's analysis and are not conclusive in their effect. For example:

Statistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger

are, of course, the primary index of market power; but only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger.

*Id.* at 322 n. 38, 82 S.Ct. at 1522. *See also General Dynamics, supra*, 415 U.S. at 498, 94 S.Ct. 1186.

■ In summary, "the statute prohibits a given merger only if the effect of *that* merger may be substantially to lessen competition."

*Brown Shoe, supra*, 370 U.S. at 332, 82 S.Ct. at 1527 (footnote omitted). The wording of § 7 "requires a prognosis of the probable future effect of the merger." *Id.* (footnote omitted). The burden to demonstrate a substantial lessening of competition or a tendency to create a monopoly lies, of course, with the plaintiff. *United States v. First Nat'l Bancorporation, Inc.*, 329 F.Supp. 1003 (D.Colo.1971), *aff'd by an equally divided Court*, 410 U.S. 577, 93 S.Ct. 1434, 35 L.Ed.2d 507 (1973). The applicable standard is well-captured by the following statement:

> The touchstone of § 7 is the probability that competition will be lessened. But before a court takes the drastic step of ordering divestiture, the evidence must be clear that such a probability exists. The Act does not require that there be a certainty of anticompetitive effect. But that does not mean that the courts or the Commission can rely on slipshod information confusingly presented and ambiguous in its implications. The law does not require proof that competition certainly will be lessened by the merger. But *the record should be clear and convincing that the requisite probability is present.*

*FTC v. Consolidated Foods, supra*, 380 U.S. at 605, 85 S.Ct. at 1228 (Stewart, J., concurring) (emphasis added).

### B. *Statistical Evidence*

■ According to the only statistics produced at trial, Pre-Mix and Mobile were, respectively, the third and fourth largest producers of ready-mix concrete in the Denver metropolitan area with a combined percentage share of the market of 31.3% in the year 1969. In 1970, Pre-Mix was the second largest producer, Mobile fourth, and their combined share of the market was 31.6%. *See* Appendix I.

The market statistics therefore present a prima facie violation of the Clayton Act according to the standard announced in *United States v. Philadelphia Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L. Ed.2d 915 (1963). That case, decided one year after *Brown Shoe*, established a quantitative test of sorts to be used in evaluating effect on competition:

> . . . we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absense of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

*Philadelphia Bank, supra*, at 363, 83 S.Ct. at 1741. The case involved the proposed merger of two banks in the 4-county Philadelphia area. Consummation of the merger would have resulted in the control of at least 30% of the commercial banking business in the relevant market by a single bank. The Court concluded that this percentage share of control was "undue," and absent mitigating circumstances, held the proposed merger a prohibited threat to competition.

■ Thus, as we apprehend the case, if the Goverment presents statistical evidence showing that the challenged merger has or will result in one firm controlling 30% of the relevant market, it has

met its initial burden of proving that the merger will substantially lessen competition. The burden then shifts to the defendants to demonstrate clearly that the merger portends no probability of substantial diminution of competition. In the instant case, we conclude that the defendants successfully satisfied this burden.

■ Horizontal mergers, of course, entail three inevitable results: (1) the combined market share percentage of the merged enterprises exceed that previously enjoyed by either of the two parties to the merger (2) the new firm will be larger in assets, and; (3) the number of competitors in the relevant market will be reduced by one. To hold these bare results sufficient to proscribe a merger under the Clayton Act would amount to an absolute prohibition against horizontal mergers—a result obviously not intended by the framers of the Act. Only those mergers which, in the industrial context peculiar to the relevant product and geographical market, give rise to a probability that competition will be lessened substantially or that monopolistic tendencies will be created are forbidden.

C. *Overview of Ready-Mix Concrete Activity in Metropolitan Area*

■ In our view, the history and structure of the ready-mix concrete market in the 4-county Denver metropolitan area imparts a uniqueness to this case which permits the instant merger despite the relatively large market shares involved.

The ready-mix concrete market in the Denver area has always been concentrated (Yordan at 188). Prior to the merger, there were 10 separate companies in the Denver metropolitan area (Appendix I). It is highly unlikely that there will ever be as many as 20 ready-mix companies in the Denver market (Yordan at 188). Any market has an upper limit on the number of producers which it can support (Peterson at 635). The only significant barrier to entry into

the Denver ready-mix concrete market is economic in view of the relatively high capital investment required due to the high cost of equipment and facilities (*e. g.,* Carter at 624). Despite high initial costs, however, new entries have been made into the market in the recent past (Meade at 308; Thompson at 502), and we have no reason to believe that this pattern will change significantly in the future. Entry is fairly possible (McKean at 502), and the economic barrier to entry can be dramatically reduced through purchase of used, rather than new, equipment (Carter at 624).

There are several practical reasons why it is probable that the Denver ready-mix concrete market will remain concentrated. First, as mentioned previously, ready-mix concrete is a market which will always be extremely localized due to the nature of the product. The cost of delivery imposes an economic limitation upon geographical market expansion (discussed *supra* at 89). Any contractor desiring to purchase ready-mix concrete for a local project must buy from a local producer (Curtiss at 139). Second, the character of the product and the context in which it is sold reflects a significant need for large-sized ready-mix companies. This is so because the business custom is to look to a single supplier to provide ready-mix concrete for a given job. Contractors ordinarily deal with only one ready-mix concrete producer with respect to a particular project for two primary reasons. First, consistency in the concrete is highly desirable, and using only concrete from a single supplier throughout construction enhances consistency. Second, and more importantly, purchasing from a single source with respect to a given project greatly simplifies planning, scheduling, and delivery of materials and work—crucially important aspects of any large building endeavor. Dividing ready-mix concrete needs among more than one supplier involves significant impracticalities and disadvantages which, in large part, can

be avoided through the practice of buying from one supplier. Furthermore, contractors large enough to undertake large construction projects must turn to ready-mix concrete producers which are of adequate size to enable them to provide the required materials expeditiously in sufficient volume and uniformity of quality. *See* Hookanson at 100–01; Curtiss at 139; Morton at 158; Craft at 553; Appell at 602.

In view of the extremely short economic delivery radius of ready-mix concrete, geographical dispersal of production plants is essential. Production facilities, delivery equipment, centralized locations, and work force are necessities which tend to militate toward largeness in ready-mix concrete companies. Thus of necessity substantial financial enterprises are involved in this industry.

Given these circumstances, the instant merger was, in part, motivated by a desire to improve the companies' competitive position due to the need to keep abreast of contractor customers, who were themselves becoming larger, in order to compete for the bigger construction jobs. Antitrust law, of course, favors internal expansion as a means of maintaining competitive position; this avenue, however, was not a feasible alternative in the present case in light of Mobile's debilitated financial condition (discussed *infra* at § VI).

In sum, the Denver metropolitan area ready-mix concrete market, historically, has been and will likely remain concentrated. The number of competitors has remained relatively stable, and no discernible trend toward greater concentration is apparent. To the contrary, the market has experienced new entrants in recent years. This case does not present a situation in which the number of companies in the relevant market was declining. *Compare, e. g., United States v. Von's Grocery Co.,* 384 U.S. 270, 277, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966).

▮ Post-acquisition evidence as to the effect of the merger uniformly suggested that the merger under challenge did not, in fact, adversely affect, nor carry the potential of adverse effect to, the competition in the relevant market. All persons questioned as to the real or probable effect on competition manifested during the post-acquisition period testified that they perceived no adverse effect on competition (Hookanson at 96–98; Curtiss at 132; Morton at 152–53; Thompson at 495 & 509; Baumgartner at 514; Flanagan at 520; Spratlen at 531; Craft at 551, and; Peterson at 628). Although we should not accord too much weight to such evidence, we may properly take cognizance of it in considering the record as a whole. *See FTC v. Consolidated Foods, supra,* 380 U.S. at 598, 85 S.Ct. 1220.

Furthermore, there was testimony to the effect that the merger involved pro-competitive effects (Hookanson at 96; Curtiss at 132; Spratlen at 534). As Congress has recognized, competition may be stimulated by particular mergers. *Brown Shoe, supra,* 370 U.S. at 319, 82 S.Ct. 1502. Service offered by the Mobile-Pre-Mix combination was superior to that offered by either of the previously independent companies alone (Morton at 152; Meade at 298; Spratlen at 534).

▮▮ The primary motive behind the merger was a desire on the part of Mobile's owners to save the company from imminent financial demise. Substantial economies could be realized through combination of the two entities. A valid business purpose obviously cannot, without more, defeat the application of the Clayton Act, but it is also a proper contextual element to consider. *Mississippi River Corp. v. FTC,* 454 F.2d 1083 (8th Cir. 1972). The merger did produce operational improvements, and more importantly, allowed Mobile to take advantage of Pre-Mix's solid line of credit and thereby avoid foreclosure on its own property (Appell at 576ff).

Also, the companies tended to complement each other in terms of customers (Meade at 305; Carter at 617; Peterson at 663).

Most significant with respect to the economic predictive judgment necessary to be made here is our conclusion (discussed more fully, *infra*, at § VI) that the probable future competitive ability of Mobile was undermined drastically by its deteriorating financial position. In *Brown Shoe, supra,* the Supreme Court has recognized that factors exist which may mitigate possible detriment to competition; they are:

> . . . the business failure or the inadequate resources of one of the parties that may have prevented it from maintaining its competitive position, [or] a demonstrated need for combination to enable small companies to enter into a more meaningful competition with those dominating the relevant markets.

*Id.* 370 U.S. at 346, 82 S.Ct. at 1535. We find that the first mitigating factor has been established clearly by the evidence in this case. Given the nature and structure of the ready-mix concrete market (discussed, *supra*, at 92), some aspects of the second factor were also present.

The Government rested its entire effort in this case on statistical evidence, attacking the instant merger from an abstract and theoretical point of view. The heart of its case on the issue of effect on competition was presented through the expert testimony of Dr. Wesley J. Yordan (Yordan at 165–209). Yordan relied primarily upon the well-known book by Kaysen and Turner, *Antitrust Policy and Economic and Legal Analysis* (1959).

We question the utility of this work when applied to an extremely localized market such as the one at hand. We agree with the opinion of Dr. Rodney D. Peterson, defendants' expert witness, that the Kaysen and Turner parameters have little meaning when applied to a narrowly localized market (Peterson at 636). We accede to the view that:

> . . . a local or regional banking market presents a wholly different competitive situation from a national retail sales or supply market in shoes, chemicals, paper or steel. We are not here dealing with nation-wide giant corporations threatening to take over an entire line of commerce and divide it up between them, and the measure of substantiality must be gauged in the context of the particular industry and market involved.

*First Nat'l Bancorporation, Inc., supra,* at 1019. This statement is equally apt when applied to a local ready-mix concrete market.

In summary, we think that despite the largeness of the market share now enjoyed by the Mobile-Pre-Mix combination, the merger presents no probability of a substantial lessening of competition, nor does it tend toward the creation of a monopoly. The Denver ready-mix concrete market has always contained a limited number of producers. The number is stable, and no trend toward increased concentration is evident (Yordan at 188; Peterson at 635). Indeed, the occurrence of new entries in the recent past indicates the contrary. Large building projects demand correspondingly sizable ready-mix concrete suppliers. As a future competitive force, Mobile's prospects were remote at best. Post-acquisition evidence, without exception, showed no adverse effect on competition wrought by the merger of Mobile and Pre-Mix. There is evidence that the merger may have, in fact, stimulated, rather than depressed, competition. No special market power on the part of the defendants as a result of the merger existed (Peterson at 640).

### D. *Conclusion*

As a practical matter, the merger challenged by this action, in all probability, carries with it no threat of substantial lessening of competition in the ready-mix concrete market, nor does it

tend to create a monopoly in that market. The totality of the evidence presented in this case shows neither clearly nor convincingly that the merger challenged here entails results prohibited by § 7 of the Clayton Act.

## VI. THE "FAILING COMPANY" DEFENSE

As an affirmative defense to the complaint, defendants assert that on or about June 12, 1970, when MPM acquired all of the outstanding stock of both Mobile and Pre-Mix, both enterprises were "failing" within the meaning of the "failing company" defense (Answer at 4).

The "failing company" doctrine is a judicially-created defense to a § 7 Clayton Act suit. It was first enunciated in *International Shoe Co. v. FTC,* 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930), in which the Court defined a "failing company" for § 7 purposes as:

> . . . a corporation with resources so depleted and the prospect of rehabilitation so remote that it face[s] the grave probability of a business failure with resulting loss to its stockholders and injury to the communities where it plants were operated . . . .

*Id.* at 302, 50 S.Ct. at 93. If, in addition to the failing condition of the acquired company, it can be shown that there was no prospective purchaser other than the one which acquired the failing company, then the merger:

> . . . is not in contemplation of law prejudicial to the public and does not substantially lessen competition or restrain commerce within the intent of the Clayton Act.

*Id.* at 302–03, 50 S.Ct. at 93. Thus the defense, as formulated in *International Shoe,* contains two elements: (1) grave probability of business failure on the

part of the acquired company, and; (2) the acquiring company being the only prospective purchaser. Proof that a company acquired in a merger was in "failing" circumstances constitutes a defense to the charge that the transaction is illegal.

The apparent rationale underlying the creation of this § 7 defense is the notion that if one of the merging companies is bound to fail, then competition cannot be substantially harmed when that company is acquired by a similar firm. *See generally,* Bok, *Section 7 of the Clayton Act and the Merging of Law and Economics,* 74 Harv.L.Rev. 226, 339–47 (1960).

More recently, the Court has described the defense in terms of a "choice of evils" approach in which "the possible threat to competition resulting from an acquisition is deemed preferable to the adverse impact on competition and other losses if the company goes out of business." *General Dynamics, supra,* 415 U.S. at 507, 94 S.Ct. at 1199 (footnote omitted). In 1950, the Clayton Act was amended to broaden its reach significantly by plugging certain loopholes in the statute which had been exploited since its inception; this extension is popularly known as the Celler-Kefauver Amendment. Both the Senate and House Reports on the amendment indicate clearly that Congress intended the "failing company" defense to survive modification and expansion of the Act and that the doctrine be carried forward to cases arising under the amendment. 1950 U.S.Code Cong.Serv. p. 4299; *Brown Shoe, supra,* 370 U.S. at 319, 82 S.Ct. 1502; *General Dynamics, supra,* 415 U.S. at 506–07, 94 S.Ct. 1186.

On several occasions since 1930 when *International Shoe* was announced, the Supreme Court has reiterated its approval of the "failing company" defense and recognized its continuing validity. The defense has been sustained in two

cases.[6] One of the Court's more comprehensive treatments of the doctrine may be found in *Citizen Publishing Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969). That case involved a joint operating agreement between two competing newspapers. Defendants principally interposed the "failing company" defense. In that case the Court found that the defendants had failed to maintain their burden of establishing the defense, and stated that "[w]e confine the failing company doctrine to its present narrow scope." *Id.* at 139, 89 S.Ct. at 931. In defining that scope, the Court appeared to add a further requirement of proof for successful assertion of the defense, namely that the "prospects of reorganization [under Chapter X or XI of the Bankruptcy Act] would have had to be dim or nonexistent to make the failing company doctrine applicable to this case." *Id.* at 138, 89 S.Ct. at 931.

Subsequent decisions dealing with the doctrine, however, omit any reference to the "dim reorganization prospects" element apparently created by *Citizen Publishing.* For example, Justice Douglas, describing the "failing company" exception to a § 7 suit for a unanimous Court in *United States v. Greater Buffalo Press,* 402 U.S. 549, 91 S.Ct. 1692, 29 L.Ed.2d 170 (1971), stated:

> That test is met only if two requirements are satisfied: (1) that the resources of International were "so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure . . . ," *International Shoe Co. v. Federal Trade Comm'n,* 280 U.S. 291, 302 [50 S.Ct. 89, 93, 74 L.Ed. 431] and (2) that there was no other prospective purchaser for it. *Citizen Publishing Co. v. United States,* 394

U.S. 131, 138 [89 S.Ct. 927, 931–932, 22 L.Ed.2d 148].

*Id.* at 555, 91 S.Ct. at 1696. The most recent discussion of the defense makes no mention of any third element but merely restates the two-pronged test laid down in *International Shoe. General Dynamics, supra,* 415 U.S. at 507, 94 S.Ct. 1186.

We conclude that a § 7 defendant need not be required to show that reorganization prospects under the Bankruptcy Act were dim or nonexistent in order to discharge its burden of proof as to the "failing company" defense. *Contra, United States Steel Corp. v. FTC,* 426 F.2d 592, 608 (6th Cir., 1970). *But see International Shoe, supra,* 280 U.S. at 301–02, 50 S.Ct. 89. *See also* Annot., 11 *A.L.R.Fed.* 858, § 6 at 872 (1972); E. Kintner, *Primer on the Law of Mergers* at 264 (1973).[7] We think that the statement as to dim reorganization prospects in *Citizen Publishing,* when read in context, should be restricted to facts peculiar to that case. As the Court pointed out, the defendants offered no evidence to demonstrate that the acquiring company was the only prospective purchaser—"the record [being] silent on what the market, if any, for the Citizen might have been." *Citizen Publishing, supra,* at 138, 89 S.Ct. at 931. Under these circumstances, the Court concluded that "[t]he prospects of reorganization of the Citizen in 1940 would have had to be dim or nonexistent to make the failing company doctrine applicable to *this* case." *Id.* at 138, 89 S.Ct. at 931 (emphasis added). Reading the statement in this context, therefore, leads us to conclude that the Court, rather than prescribing a third element to the defense by its dim reorganization prospects language, was

---

6. Our research reflects the following two cases in which the defense has been sustained: *United States v. Maryland & Virginia Milk Producers Ass'n, Inc.,* 167 F.Supp. 799 (D.D. C.1958), *aff'd on other grounds,* 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960) and *Granader v. Public Bank,* 281 F.Supp. 120

(E.D.Mich.1967), *aff'd,* 417 F.2d 75 (6th Cir. 1969), *cert. denied,* 397 U.S. 1065, 90 S.Ct. 1503, 25 L.Ed.2d 686 (1970).

7. An excellent treatise published by MacMillan Company, New York.

suggesting an alternative to the second prong (no other prospective purchaser) of the two-pronged test set forth in *International Shoe.* This interpretation, we think, reasonably squares the Court's discussions of the "failing company" doctrine contained in *Citizen Publishing* (which seems to add the dim reorganization prospects element) and those found in the other earlier and later cases (which make no reference to this possible requirement). Another reason for holding that proof of dim reorganization prospects is not a necessary predicate to the "failing company" defense is the fact that the cases subsequent to *Citizen Publishing* omit any reference to this element and, therefore, by implication have dispensed with it.

In short, we feel that if the evidence demonstrates that one of the merging companies faced a grave probability of business failure at the time of the merger and the other party to the merger was the only prospective purchaser, then the "failing company" defense has been satisfactorily established. Reorganization prospects may play a significant role in a particular defendant's attempt to substantiate the defense. We merely hold that the failure to address reorganization prospects—at least where there is, as here, evidence as to the market for the failing company—cannot conclusively defeat an effort to establish the defense.

A. *The "Failing Company" Defense as Applied to the Instant Case*

The complaint challenges as violative of § 7 of the Clayton Act two distinct events: (1) the June 12, 1970, acquisition by MPM of all of the outstanding stock in both Mobile and Pre-Mix, and; (2) the November 12, 1971, merger of Mobile and Pre-Mix in accordance with the Colorado Corporation Code (Complaint at 4). In our view, the only transaction relevant to the present suit is the June 12, 1970, arrangement whereby two previously separate and independent competitors were brought under the same aegis and management.

■ The only significance of the November 12, 1971, merger was to formalize what had, in fact, existed throughout the previous calendar year. To our mind, if a violation of the Clayton Act occurred, it occurred at the time the two companies entered into joint operation and lost their relative identities as competitors when acquired by MPM. Therefore, the time period pertinent to the "failing company" defense relates to the facts as they existed at or before the stock acquisition accomplished through MPM: the months leading up to June 12, 1970.

Our conclusion in this regard finds ample support in *Citizen Publishing, supra,* in which the Court chose not to look at the time of the formal extension of the joint operating agreement involved in that action—1953. Rather, for purposes of determining whether the "failing company" defense was fulfilled, the Court looked to the time the agreement was originally formulated—1940. *See Citizen Publishing, supra.*

■ Defendants have asserted in their Answer that both Mobile and Pre-Mix were "failing companies" at the time of the acquisition of them by MPM (Answer at 4). Considerable evidence was adduced at trial relative to this defense. However, little or none of it pertained to Pre-Mix. This defense, therefore, was seriously proffered only with respect to Mobile, and the evidence fails to support a finding that Pre-Mix was a failing company. Thus, if defendants are to succeed in maintaining this defense, they can do so only by showing that Mobile was a failing company.

We recognize that in the case at bar the alleged "failing company" acquired a non-failing entity. Ordinarily, the roles are reversed in a merger case, and, understandably it is the stronger company which usually acquires the failing one.

■ Careful analysis of the rationale underlying the "failing company" doctrine, however, leads to the conclusion

that this reversal of traditional roles should not *per se* defeat the application of the defense. If one subscribes to the premise that the merger of an ongoing business with a failing competitor cannot substantially lessen competition or if one accedes to the "choice of evils" theory which permits the combination of a viable and a terminally weak competitor, then which of the two companies is the purchaser has little theoretical or practical significance. The underlying purposes of allowing the defense have been served so long as one of the two entities to a merger is shown to have been in a failing condition at the time of the merger. In so holding, we reject rigid obeisance to technical labels and look to the substance of a given transaction. Clayton Act cases are to be viewed functionally, in terms of economic realities applicable to a particular business transaction. *General Dynamics, supra,* 415 U.S. at 498, 94 S.Ct. 1186.

Furthermore, as mentioned above, the allegedly improper activity challenged in this case is the June 12, 1970 acquisition by MPM of the stock of Mobile and Pre-Mix. In our view, when the action involves, as here, the acquisition of two competitors by a third entity, common sense suggests that it should make no difference at law which of the two companies being joined together is "failing." The effect on competition, if any, will be the same, regardless of whether one company or the other is denominated as "acquiring" or "acquired."

**B.** *Evidence Pertaining to the "Failing Company" Defense*

The record demonstrates that prior to the challenged acquisition of Mobile and Pre-Mix stock by MPM on June 12, 1970, Mobile was deeply in debt and in very serious and dire financial straits. Its situation was precarious, deteriorating, and bleak. Virtual collapse of the enterprise was imminent and inevitable. Officers of Mobile engaged in extensive, sincere, and ambitious efforts to stave off business failure. Painstaking and concrete attempts were made to recruit new investors and obtain fresh financial backing and capital and/or to sell the business. These endeavors were uniformly unsuccessful with the sole exception of the transaction ultimately arranged with Pre-Mix which is the subject of this suit.

 We expressly find that from a financial viewpoint Mobile was irretrievably failing without possibility of recovery. From a totality of the record as a whole and for the reasons expressed below, we conclude that the defendants have satisfactorily discharged their burden in proving that, at the time of the purportedly unlawful stock acquisition, Mobile was a "failing company" within the meaning of the pertinent authorities.

**1.** *Grave Probability of Business Failure* [8]

For purposes pertinent herein, Mobile came into existence on June 1, 1967, when it was formed as a Colorado corporation in order to assume the assets and business of an existing corporation of the same name. There were three shareholders: (1) Thomas W. Meade—majority 57% shareholder and active manager; (2) Burton C. Boothby—a 21 & ½% shareholder, and; (3) L. C. Fulenwider—a 21 & ½% shareholder (Meade at 272–74 & 315–16; Boothby at 717–18). In addition to the capital contributions made by the three shareholders, capital was provided by virtue of credit arrangements with the former owner (Meade at 273) and by the Denver U.S. Bank (Meade at 303; Appell at 566–67) (now known as the United Bank of Denver and *hereinafter* referred to as "Bank"). Initially, the Bank extended Mobile credit in the form of

---

8. *See generally* the testimony of Meade (270–323), Carvill (385–414 & 431–61), Appell (565–606), and Boothby (713–39). For the Government's primary witness in rebuttal on this issue, *see* the testimony of Kesselman (775–823).

loans secured by realty, equipment, and accounts receivable (Appell at 566–67). At all times pertinent to the present action, the Bank, for all practical purposes, was and remains Mobile's exclusive source of commercial credit.

No profits were realized from the operation of Mobile during its first three years of existence (Meade at 275; GX 7, 8 & 9; DX I, J & K). By the fall of 1969, the Bank expressed very serious apprehension with respect to the safety of its credit in light of Mobile's precarious financial condition (Meade at 279; Appell at 563). The financial statement for the term ending May 31, 1969, indicated a cumulative 2-year loss of more than $100,000 (Meade at 279; DX 8). The quarterly statement for the period ending August 31, 1969 reflected a profit of $11,000 during the peak sales season; however, this modest gain was quickly negated by a $37,000 loss for the months of September and October, 1969 (Meade at 279). Upon receipt of these unpromising statements, Mr. Charles W. Appell,[9] the Bank Vice President and officer in charge of the Mobile account, commenced a personal investigation to ascertain the true state of Mobile's present and predicted financial status (Meade at 309; Carvill at 391–92; Appell at 568–69 & 572).

Appell's inquiry included several visits to Mobile's office and meetings with Meade (Mobile's president), Carvill (a certified public accountant and the company accountant), and others (Meade at 281–82). Through this investigation, Appell learned that the losses were substantial and likely to continue (Appell at 561 & 581). He also learned that Mobile's capital had been significantly diminished through advances to Mobile Concrete of Colorado Springs, a second ready-mix concrete company formed by the principals of Mobile (Meade at 278; Appell at 572–73).

Ultimately, in light of what Appell perceived as a very tenuous and debilitated financial situation (Appell at 590), he notified Meade, Boothby, and Fulenwider that, as a condition precedent to further credit extensions by the Bank, Mobile would have to provide at least $200,000 of new cash for the business (Meade at 280–86; Appell at 573–79; Boothby at 719; DX V). Mr. Appell testified that Mobile's financial condition was "very much deteriorated" (Appell at 575) and that the company would surely fail (Appell at 590). Mobile's line of credit with the Bank was due to expire in the fall of 1969. However, in order to allow Mobile an opportunity to raise the necessary additional funds, Appell agreed to a short-term credit extension through November (Appell at 570 & 576–78).

Meade and Boothby were both unable to supply needed cash personally, and Fulenwider refused to do so, feeling that the company should be sold (Meade at 281–82; Boothby at 719–20). Mobile was dependent upon the Bank for continued existence (Boothby at 721; Appell at 570–80), and the Bank threatened to shut down operations and put Mobile's assets up for auction if the necessary infusion of cash were not forthcoming (Meade at 285; Boothby at 721; Appell at 581–82). In order to avoid a fatal cut-off of credit and repossession of assets by the Bank, both Meade and Boothby conducted extensive searches to raise the $200,000 required to maintain Mobile's line of credit with the Bank. *See infra* at subsection 2.

The Bank finally withdrew the line of credit in December, 1969 (Meade at 278). By January, 1970, Mobile was indebted to the Bank in the amount of $524,000 (Meade at 283), and initial fund-raising contacts had proved unavailing. Only through assumption of personal liability by Boothby was Mobile able to convince the Bank to continue to finance business operations. Boothby pledged additional collateral from personal real estate holdings (a

---

9. Mr. Appell is an experienced bank and loan officer who was thoroughly familiar with all facets of the Mobile operation.

$130,000 mortgage on an apartment complex) and entered a personal commitment to raise $70,000 more (Appell at 579 & 581–84; Boothby at 84). This incurrence of personal liability for the corporate debts constituted a stop-gap measure to provide some additional time within which to raise the required $200,-000 or to sell the business. To enhance salability of Mobile, it was felt that it should continue operations (Boothby at 721).

Mobile continued to do business on a shoestring day-to-day basis by resorting to questionable, manipulative financial practices in order to satisfy short-term creditors. "Kiting," a procedure whereby company drawing accounts are credited after checks are issued but before presentment, enabled the company to maintain a facade of financial stability (Carvill at 398).

In terms of the equity definition of "insolvency" (inability to meet obligations as they become due), the evidence indicated that Mobile was insolvent in the months preceding the MPM stock take-over in mid-1970 since it was unable to pay its bills as they matured——at least without unseemly manipulation of its financial accounts (Meade at 302–04; Carvill at 398, 404 & 448; Corwin at 688).

The most significant rebuttal evidence on the issue of whether Mobile was financially *in extremis* at the time the arrangement with Pre-Mix was concluded was the testimony of Dr. Jerome J. Kesselman,[10] a Government expert witness. In his opinion, Mobile did not face the grave probability of business failure, despite the dismal economic performance and outlook reflected in its annual statements and tax returns (Kesselman at 776). Dr. Kesselman took exception to the accounting approaches taken by Mobile's accountants and suggested that the procedures utilized deviated from those generally accepted by the accounting profession. He testified to errors contained in the pertinent finan-

cial statements and opined that "it was very unlikely that Mobile Concrete was a failing company" (Kesselman at 776–77). While the testimony of this highly qualified expert added a new dimension to the Court's consideration, we feel that its probative value was outweighed by the testimony of those persons more intimately involved in the actual day-to-day operation of Mobile. In our view, the appraisals of Mobile's financial condition offered by its officers, accountants, the Bank loan officer, and other potential investors present a more practical and direct evaluation of Mobile's future as an ongoing enterprise in functional and pragmatic terms.

While Mobile was experiencing a financial crisis by the Bank's threatened severance of credit, Meade and Boothby attempted to ward off collapse of the company by conducting an ambitious campaign to locate persons, both individuals and institutions, who might have been willing either to invest new money into the enterprise or to purchase it outright. In the minds of most, if not all, of those approached in this regard, Mobile was felt to be a failure-destined concern. *See* discussion, *infra* at subsection 2. This was likewise the business opinion of Mr. Appell (Appell at 590).

Meanwhile, in the spring of 1970, an attractive opportunity to combine Mobile with an economically healthy competitor arose when Boothby learned of the intention on the part of the owners of Pre-Mix to divest themselves of this entity (Boothby at 728). This avenue was immediately pursued, and the prospect of combining the two companies was the sole reason for the Bank's postponement of foreclosure (Meade at 298; Appell at 590–91). Pre-Mix, as it turned out, could be purchased for little or no cash on a long-term credit basis (Boothby at 728). The advantages of combining management and office overhead and of riding the credit coattails of Pre-Mix were highly attractive to Meade and

10. Dr. Kesselman is a certified public accountant, an attorney, and a faculty member of the University of Denver.

Boothby. They pursued and ultimately secured an agreement to buy Pre-Mix and to operate it jointly with Mobile. This arrangement, in their view and ours, allowed Mobile to avoid almost certain total financial collapse.

In sum, we find that the evidence supports the conclusion that in the months preceding the combination of Mobile and Pre-Mix, Mobile faced a grave probability of business failure. Numerous symptoms indicated that Mobile was declining ineluctably toward economic collapse. It had never experienced a profit for any fiscal year since it was acquired by Meade, Boothby, and Fulenwider in 1967. Business losses accumulated at an alarming rate and magnitude. Mobile's market share decreased from 1969 to 1970. The ratio of the company's net worth to total debt was precipitously low and declining. Its exclusive commercial lender was threatening a cut-off of credit and foreclosure. Working capital was scarce. Further functioning of the business was possible only through the agreement of certain principals to incur personal liability on the company's debts. Operating expenses could be met only by improper manipulation of company accounts.

From a totality of these factors, we conclude that prior to consolidation of the two companies Mobile was faced with inevitable business failure and that the transaction with Pre-Mix was the only feasible avenue of escape from a collision course with financial ruin.

2. *No Other Prospective Purchaser*

As noted above, when the Bank informed Mobile that it must raise an additional $200,000 in new capital before it would extend further credit, Meade and Boothby commenced extensive efforts to find persons willing to invest in or purchase the business. They explored virtually every potential source of funding. The evidence presented leaves no doubt in our mind as to the sufficiency and good faith of these attempts.

In a continuous struggle to find a way to keep Mobile from going out of business, Meade contacted the following persons and institutions for help: the Thomasson brothers (Meade at 284; Thomasson at 334 & 349), Boettcher & Company (Meade at 289; Wiesner at 561), Rollnick (Meade at 289), the Associates Financial Services Co. of Colorado (Meade at 289), the Small Business Association (Sakdol at 608; Meade at 292), Schmidt (Meade at 293; Schmidt at 354), Willis (Meade at 296), and Anderson (Meade at 296). At least two additional contacts were made by Meade through the Thomasson brothers (Thomasson at 335–37). All of these meetings proved unavailing; most, if not all, of those persons approached refused either investment or purchase on the ground that Mobile appeared inevitably headed for bankruptcy.

Boothby devoted substantially all of his time toward the task of exploring investment and sales prospects after the Bank threatened drastic action if new funds were not raised immediately (Boothby at 723 & 727). He participated in approaches to as many as 12 persons in an effort to save or sell Mobile (Boothby at 723). Several contacts overlapped with those investigated by Meade; others were different prospects. New contacts made by Boothby included, among others, Farkas (361–62) and Rieger (380–82), both of whom were capable prospects. Overtures to them were realistic but unfruitful.

In addition to the persons directly contacted by Meade and Boothby, other persons likewise aided in the search for investors and/or purchasers, among whom were: Boettcher & Company (Wiesner at 562), Fulenwider, Sakdol (606 & 609), Carvill (388–89 & 390–91), and Thomasson (335–37).

The contacts made were thus numerous, and the record indicates that all those persons approached were credible potential sources of capital who were able to take advantage of the offers with regard to Mobile had they so chosen. With the sole exception of Pre-Mix, however, all of the persons approached declined involvement with Mobile, typically

because Mobile was considered a very bad business risk.

Thomasson, for example, after close inspection of Mobile's situation, considered the company "underfinanced" (332) and concluded that "bankruptcy was imminent and no amount of time would get them out of their difficulty" (334). He regarded Mobile's future with such pessimism that he chose not to try to interest his own bank in the offer (337) and felt that it would have been futile for Mobile to contact other lending institutions (338). Schmidt regarded investment in or purchase of Mobile ill-advised, expressing an opinion that there would only be a "very slim chance" of a return on the investment (358) and that the future existence of Mobile was questionable (359). Farkas was readily discouraged from entering into business dealings with Mobile. Analysis of the financial statements led him to conclude that the company was not "very solid" (363), a primary factor being the high debt ratio of nine or ten to one (364). Willis readily rejected overtures from Mobile, telling Meade that "they were broke and just didn't know it at the time" (374). Wiesner, an investment banker, could see "no way" of underwriting a stock issue for Mobile in view of its "minimal" net worth (563). He also expressed the belief that if Mobile were unable to salvage its credit relationship with the Bank, it was highly unlikely that it could secure credit from any other bank (565). Rieger was of the opinion that the "company would not survive" (384).

In short, none of the efforts to ferret out funds needed to stay in business or to sell the company was successful with the single exception of the Pre-Mix opportunity. This alternative came to light in late March, 1970 (Meade at 298). Meade learned that the directors of Pre-Mix's parent company had ordered the sale of Pre-Mix. As an established, profitable Denver ready-mix concrete company with a customer market which, in large part, complemented rather than directly competed with Mobile, the possibility of combining the two operations was an immediately attractive alternative which might bring Mobile out of financial debilitation (Meade at 298–302; Appell at 591). Evidence indicated that Pre-Mix was a better managed organization with a sound financial standing. Pre-Mix largely dealt with commercial and industrial builders, while Mobile's market was concentrated among residential contractors. Additional physical plants enhanced business opportunities.

In April of 1970, Boothby initiated negotiations to explore the possibility of acquiring Pre-Mix and combining it with Mobile (Boothby at 728). The alternative was financially realistic and appealing when Boothby learned that the purchase of Pre-Mix could be carried out without the need to put up any initial cash (Boothby at 728; Carvill at 406). Ultimately, the deal was consummated through the device of a holding company (MPM) formed by Meade and Boothby for the purpose of acquiring all of the outstanding stock of both Mobile and Pre-Mix (Meade at 306–07).

The weight of the evidence persuades us that the only available avenue of salvation for Mobile was the Pre-Mix transaction. No other prospect would become involved with Mobile. Pre-Mix would—and would do so on a no cash basis. Under all of the circumstances presented, therefore, there was no other prospective entity with which to combine Mobile in order to avoid business failure.

### C. Conclusion

■ The overwhelming evidence established to our satisfaction that Mobile was a "failing company." The officers of Mobile conducted an earnest, wide-ranging, and good faith effort to locate potential investors or purchasers in order to maintain Mobile as a going concern. The contacts were numerous and varied during a time when Mobile faced a grave probability of business failure. With the sole exception of the ultimately concluded arrangement with Pre-Mix, all attempts to find another purchaser were uniformly fruitless. Thus we must find that the weight of the

evidence support the conclusion that, under the circumstances presented, Pre-Mix was the only prospective "purchaser" [11] of Mobile. When this finding is coupled with our conclusion that Mobile faced the grave probability of business failure, we must hold that the defendants in this case have fully satisfied the elements of the "failing company" defense.

## VII. EQUITABLE AND CONSTITUTIONAL DEFENSES

Prior to institution of the present suit, defendants herein were involved in other actions brought in this District under the antitrust laws. We take judicial notice of the records in these cases.[12] Pre-Mix and Mobile, among others, were named as defendants in *United States v. Metro Denver Concrete Ass'n,* Criminal No. 70–CR–181 (D.Colo., complaint filed Aug. 6, 1970) in which the Government alleged violations of § 1 of the Sherman Act, 15 U.S.C. § 1 (1890). On February 12, 1971, all defendants entered pleas of *nolo contendere,* and sentence was imposed by Chief Judge Alfred A. Arraj of this Court on March 10, 1971. In *United States v. Metro Denver Concrete Ass'n,* Civil No. C–2478 (D.Colo., complaint filed Aug. 6, 1970), Pre-Mix and Mobile were among the defendants in a civil action brought under § 4 of the Sherman Act, 15 U.S.C. § 4 (1890). Pursuant to a consent decree executed by the defendants, final judgment in this matter was entered on February 28, 1972, by Chief Judge Arraj.

Defendants contend that the instant suit (filed on April 11, 1972) was motivated by the Government's desire to inflict further penalties upon them in addition to those incurred by reason of the aforementioned lawsuits. In vague fashion, defendants argue that prosecution of this action deprives them of due process of law for the reason that institution of it reflects a pattern of selective enforcement of the Clayton Act premised upon a perverse desire on the part of the Government to heap further punishment upon them.

In addition, defendants assert in the nature of an equitable defense the claim that the merger complained of in this action (in reference to the formal merger of Nov. 12, 1971) occurred with the knowledge of and due to pressures exerted by the Government. Therefore, they maintain that the Government should be held equitably estopped from prosecuting this suit.

We reject these defenses.

### A. The Equitable Defense

Primarily, this defense must fail on the ground of immateriality. As we have mentioned above *(supra* at 97), the only activity of the defendants with which we are concerned is the June 12, 1970 acquisition by MPM of all of the outstanding stock of both Mobile and Pre-Mix. We are not therefore concerned with the formal merger, nor with any defenses asserted with respect to it. The merger being immaterial to this action, the possible impetus behind it or its challenge is likewise immaterial.

Second, we note that the consent decree in Civil Action No. C–2478 to which Mobile and Pre-Mix were parties forbade communication among all signatories as to ready-mix concrete business matters. Since the two companies were already being jointly operated before entry of the consent decree, the decision to merge formally appears to have been motivated, in part, by the desire of the principals involved to continue joint operation of the companies while at the same time acceding to the consent decree. By making Mobile and Pre-Mix one company, they could then sign the consent decree and maintain their operating status quo. Formal merger thus represented a logical, voluntary choice on the part of Mobile and Pre-Mix officials.

Third, the transcript in Civil Action No. C–2478 makes clear that prior to entry of the consent decree, the defend-

---

11. *See* discussion of roles *vis-a-vis* the "failing company" defense *supra* at 97.

12. *See also* GX 34 and GX 34a.

ants were put on notice that execution of this agreement should not be construed as an indication on the part of the Government to abandon future action against Mobile and Pre-Mix based on their joint business conduct. Tr., C-2478, at 6.

Finally, equitable defenses " 'do not apply to actions brought by the United States in its sovereign capacity where they would frustrate the purpose of its law or thwart its public policy.' " *United States v. Shubert,* 14 F.R.D. 471, 474 (S.D.N.Y.1953).

B. *The Constitutional Defense*

 This contention is so vague as to be without meaning. In diffuse fashion, defendants accuse the Government of singling them out for special punishment. This argument is make-weight, in our opinion, and readily deflated when the 1968 Department of Justice Merger Guidelines are compared to the industry statistics presented in this case. Under the Merger Guidelines [13] the Department of Justice will ordinarily challenge a horizontal merger between companies in a less highly concentrated market which, as here, account for more than 30% of the relevant market. The figures in this case substantially exceed the parameters used by the Department of Justice in determining whether to challenge a given merger. Nothing presented to this Court suggests an abuse of prosecutorial discretion of a magnitude sufficient to lead to deprivation of a right of constitutional dimension. We expressly find no bad faith on the part of the plaintiff in filing this action.

C. *Conclusion*

In view of the above, we hold that defendants have failed to prove any defense of an equitable or constitutional nature in this case.

### HOLDING

The above constitutes our Findings of Fact and Conclusions of Law as required

by Rule 52 of the Federal Rules of Civil Procedure.

In accordance with this Opinion, it is hereby ordered that Judgment in this action shall be entered in favor of Defendants and against the Plaintiff.[14]

### APPENDIX I

This information is contained in a sealed envelope for the use of this Court, the Supreme Court, and the parties only. *See* footnote, *supra* at 83.

### APPENDIX II

Since June 1, 1967, Mobile operated plants for the production of ready-mix concrete at the following locations:

1. 7777 East Iliff Avenue; Denver, Arapahoe County.

2. Morrison Road & Kipling Street; Denver, Jefferson County.

3. 14111 West 44th Avenue; Denver, Jefferson County.

4. Smith Road; Denver County (1969 only).

5. 48th Avenue & Quebec Street; Commerce City, Adams County.

Pre-Mix, during the times pertinent to this action, operated plants at the following locations:

A. 1500 West 12th Avenue; Denver County.

B. Smith Road & Clinton Street; Denver County.

C. 4800 South Windermere Avenue; Littleton, Arapahoe County.

D. 2100 West Oxford Avenue; Denver, Arapahoe County (1969 only).

E. 2251 East 104th Avenue; Northglenn, Adams County.

F. 23rd & Delgany; Denver County (discontinued in 1968).

G. 40th & Youngfield; Wheatridge, Jefferson County (since 1972).

*See* P/T 1 at 8-9. *See also* map at 105 and GX 22.

---

13. 1 Trade Reg.Rptr. 4330 at 6682.

14. Issuance of this Memorandum Opinion and Order was delayed, pending final decision by the Supreme Court in the case of *Gulf Oil Corp., supra* at 85, to determine what bearing, if any, that case may have had upon this litigation.